Meng v. Coffee.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

JENS C. MENG, APPELLANT, V. CHARLES F. COFFEE ET AL., APPELLEES.

FILED FEBRUARY 4, 1903. No. 9,837.

Commissioner's opinion, Department No. 2.

1. **Common Law:** POWER OF COURTS TO DECLARE THE SAME INAPPLICABLE. The power of the courts to declare established doctrines of the common law inapplicable to this state should be used somewhat sparingly, and its exercise is not to be justified unless the inapplicability of a rule is general, extending to the whole or the greater part of the state, or, at least, to an area capable of definite judicial ascertainment.

2. **Riparian Owners:** RIGHTS MODIFIED BY STATUTE. The common-law rules as to the rights and duties of riparian owners are in force in every part of the state, except as altered or modified by statutes.

3. **Rights Defined.** The common law does not give to a riparian owner an absolute and exclusive right to the flow of all the water of the stream in its natural state, but only a right to the benefit and advantage of the water flowing past his land so far as consistent with a like right in all other riparian owners.

4. **Riparian Owners:** REGULATION OF USE OF WATER: SMALL QUANTITIES: LARGE QUANTITIES: THE LAW DISTINGUISHES. In regulating the use of water by riparian owners, the law distinguishes between those modes of use which ordinarily involve the taking of small quantities and but little interference with the stream, and those which necessarily involve the taking or diversion of large quantities and a considerable interference with its ordinary course and flow.

5. **Purpose of the Law as to Use of Water by Riparian Owners.** The purpose of the law as to use of water by riparian owners, is to secure equality therein, as near as may be, to each, by requiring each to exercise his rights reasonably, and with due regard to the right of other riparian owners to apply the water to the same or other purposes.

6. **Irrigation:** USE WHICH RIPARIAN OWNER MAY MAKE OF WATER. A riparian owner may take water from a stream for purposes of irrigation. But his use of the water for such purposes must be reasonable with reference to the size, situation and character

Syllabus by court; catch-words by editor.

of the stream, the uses to which its waters may be put by other riparian owners, the season of the year and the nature of the region; and he must not, in so doing, unreasonably diminish or wholly consume such water, to the injury of other owners, nor so as to prevent reasonable use of it by them.

7. **Reasonable Use of Water a Question of Fact.** What is a reasonable use of water for irrigation is largely a question of fact, depending upon the circumstances of each case, and one which may be viewed with some liberality in semiarid regions, where use for such purposes necessarily involves much loss; but waste, needless diminution, or total consumption of a stream, to the injury of others, is clearly unreasonable.

8. **Squatter's Right:** STATE LAW: DECISIONS OF COURTS: PRESCRIPTIVE RIGHT. An appropriation of water by "squatter's right," not recognized by the laws of this state, the decisions of its courts, nor any general, well-recognized or widely respected custom therein, does not, by virtue of section 2339, Revised Statutes of the United States, give to the settler who has appropriated water in that way for a less period than ten years an exclusive right as against other settlers upon the same stream.

9. **Settler's Appropriation of Water:** TACKING. But a settler who so appropriates water, and afterwards duly enters and receives a patent to the land from the government, may, as against other patentees from the government upon the same stream, count the time during which he appropriated the water as a mere squatter in making out the statutory period of prescription.

10. **Appropriation of Considerable Quantities:** SEASON, WET OR DRY: INFERIOR OWNERS. Appropriation of considerable quantities of water in seasons when that may be done without sensible injury to lower owners, does not give a prescriptive right to divert the whole stream in dry seasons.

APPEAL from the district court for Sioux county. Petition for a perpetual injunction by an inferior riparian owner against his superior riparian owners. Heard below before WESTOVER, J. Decision below adverse to the plaintiff. Attempted appeal dismissed.* Judgment entered below on original finding. Second appeal. *Affirmed in part.*

*Chambers Kellar* and *Nathan K. Griggs,* for appellant.

*Allen G. Fisher, contra.*

* 52 Nebr., 44.

POUND, C.

This suit was brought in 1893 to enjoin the defendants, upper riparian owners upon Hat creek and its several tributaries, from diverting the waters of said streams for irrigation purposes to such extent as to deprive the plaintiff, a lower owner, of the use of the stream. Upon trial a decision was announced orally adverse to the plaintiff. On appeal to this court, it appeared that no final decree had been entered in accordance with such announcement, and the appeal failed. Thereafter a decree dismissing the cause and following the findings originally announced was duly entered, from which the present appeal is prosecuted. The defendants justify their diversions of the waters of said streams upon these grounds: (1) Prior appropriation; (2) that irrigation of meadow land to produce forage for their stock is a "domestic" use of the water, for which, if necessary, they may consume the whole; (3) that they have a right to divert the water, as against the plaintiff, by reason of section 2339, Revised Statutes of the United States; (4) that the character of the soil in the region in question and the nature of the beds of the streams are such that the waters diverted would be lost by evaporation and absorption in any event before reaching the plaintiff; and (5) that they have acquired rights to divert the water by prescription. The alleged appropriations were long prior to any legislation authorizing the same, and no questions under the present irrigation laws are before us in this case.

The first two positions are clearly untenable if this court is to adhere to its repeated pronouncements that the rules of the common law as to the rights and duties of riparian owners are in force in this state. *Clark v. Cambridge & Arapahoe Irrigation & Improvement Co.*, 45 Nebr., 798; *Gill v. Lydick*, 40 Nebr., 508; *Eidemiller Ice Co. v. Guthrie*, 42 Nebr., 238, 28 L. R. A., 581; *Slattery v. Harley*, 58 Nebr., 575; *Crawford Co. v. Hathaway*, 60 Nebr., 754, 61 Nebr., 31. But in view of the general mis-

conception of the scope and purpose of those rules and their effect upon irrigation, and the earnest and able arguments which have been presented in the endeavor to bring the court to a contrary conclusion, it has seemed proper to treat the question as *res integra,* and for that purpose the arguments in the several other cases now pending which involve the soundness of the prior decisions referred to have been considered in connection with those in the case at bar.

A great deal of what has been urged upon us as demonstrating the inapplicability of the rules of the common law upon this head to conditions in Nebraska proceeds upon an erroneous impression of the nature and purpose of such rules. Thus, in a brief in which the subject is most elaborately and exhaustively discussed, counsel say: "No riparian proprietor in Nebraska today is entitled to the full flow of the stream through his premises just for the pleasure it may give him to see the stream filling its banks.   *   *   *   The use of the water belongs to the people." And throughout that brief, and in all the arguments we have examined, it is assumed that at common law taking of water from a stream is an injury to the riparian proprietor, and that the latter may insist that no water whatever shall go out. The common law does not hold to so unreasonable a rule. On the contrary, it considers running water *publici juris,* and while it will not permit any one man to monopolize all the water of a running stream when there are other riparian owners who need and may use it also, neither does it grant to any riparian owner an absolute right to insist that every drop of the water flow past his land exactly as it would in a state of nature. "No one," said Nelson, J., in *Howard v. Ingersoll,* 13 How. [U. S.], 380, 426, 14 L. Ed., 189, "can set up a claim to an exclusive right to the flow of all the water in its natural state; and that what he may not wish to use himself shall flow on till lost in the ocean. Streams of water are intended for the use and comfort of man; and it would be unreasonable, and contrary to the uni-

versal sense of mankind, to debar a riparian proprietor from the application of the water to domestic, agricultural, and manufacturing purposes, provided the use works no substantial injury to others." In *Embrey v. Owen*,[*] 6 Ex. [Eng.], *353, a case involving the right to use water for irrigation, Parke, B., said (p. 368) : "This right to the benefit and advantage of the water flowing past his land, is not an absolute and exclusive right to the flow of all the water in its natural state; * * * but it is a right only to the flow of the water, and the enjoyment of it, subject to the similar rights of all the proprietors of the banks on each side to the reasonable enjoyment of the same gift of Providence." In the leading case of *Elliot v. Fitchburg R. Co.*,[†] 10 Cush. [Mass.], 191, 57 Am. Dec., 85, Shaw, C. J., said : "The right to the use of flowing water is *publici juris*, and common to all the riparian proprietors; * * * it is a right to the flow and enjoyment of the water, subject to a similar right in all the proprietors." The common law seeks to secure equality in use of the water among all those who are so situated that they may use it. It does not give any riparian owner property in the *corpus* of the water, either so as to be able to take all of it, or so as to insist that every drop of it flow in its natural channel. *Vernon Irrigation Co. v. City of Los Angeles*, 106 Cal., 237.

When, therefore, counsel tell us that their clients have a natural right to irrigate, and that reasonable use of the water is necessary in the exercise of that right, they urge nothing against the rules of the common law, since the latter merely insist that others along the streams in question have the same natural right, and permit every rea-

---

[*] There is a most valuable note at the end of this case on page 372. Lawyers preparing briefs on this subject are recommended to consult it. It relates particularly to the rights of riparian proprietors, and contains citations both from England and the States.— W. F. B.

[†] The author of the opinion in this case refers to *Embrey v. Owen*, *supra*, as having settled the law; and, in a separate paragraph, Shaw proceeds to use almost the exact language of Parke.—W. F. B.

sonable use by each consistent with like use by all. The apparent modifications of the common-law rules in the semiarid or arid states, in that courts of such states are more liberal in their construction of what is a reasonable use, are no departure from the principles on which the rules are founded. On the contrary, they carry them to their logical conclusion in view of the special conditions of such regions.

Understanding what is meant by the general common-law rule as to riparian rights, and bearing in mind that it does not give to a riparian owner an absolute and exclusive right to the flow of all the water of the stream in its natural state, but only a right to the benefit and advantage of the water flowing past his land so far as consistent with a like right in all other riparian owners, we come next to the question, is such rule in force in this state? Much of what has been urged to show that the rule is inapplicable to our conditions, and hence not in force under chapter 15a, Compiled Statutes (Annotated Statutes, sec. 6950), is deprived of its effect by proper statement and limitation of the rule itself and apprehension of the principle on which it proceeds. It is further to be noted that the rule has long been in operation without complaint or objection in the eastern portion of the state, and that the difficulties now asserted arise quite as much from the necessity of application of the principles of the common law to the different circumstances of the semiarid portions of the state so as to reach detailed rules applicable to those sections, as from any inherent deficiency in the principles themselves. It is obvious that whatever rule is adopted must be of general effect throughout the state, or, at the least, if there are to be two rules, the areas within which they are to prevail respectively must be capable of judicial recognition. The territory of each rule must be known to the courts as something of which they take judicial notice. But this is not an arid state. Only a portion of it may be so described with propriety, and there is no arbitrary line by which the arid portions are

bounded so as to be judicially recognizable. In the Pacific
states, where one rule is applied with reference to the pub-
lic domain and another in cases of private ownership, the
limits are not subject to dispute. But, in this state,
whether a particular locality is or is not arid is a question
of fact in each case (*Slattery v. Harley,* 58 Nebr., 575,
577), and it would be an anomaly to have the rules of law
by which a cause is to be governed depend upon such an
issue, and be triable to a jury. Moreover, if a rule of
the common law is to be rejected as inapplicable to our
state, it must be because its inapplicability is general
throughout the state. If it were conceded that the ex-
treme western portion of the state presents conditions to
which the common-law rule is not applicable, how are we
in a state like Nebraska, in which the diversity of extreme
conditions is great, and yet the transitions are gradual
and imperceptible, to draw any line at which we may say
one condition ceases and another begins? Where purely
arbitrary, the drawing of such a line would be legislation;
and nothing short of anarchy could result from leaving it
undrawn with two conflicting rules in force. What is
needed in such cases is a sound and practical mode of
applying the principles of the common law to the peculiar
conditions of arid or semiarid localities, not a sweeping
act of judicial legislation requiring not a little supple-
mentary legislation of the same oblique character. In a
case like the one at bar, where but a few of the questions
inevitably to arise could be involved, complete formula-
tion of a system of rules would be improper and impos-
sible. But to abrogate the existing law as to riparian
rights and put anything less than an equally complete
system in its place, would result in a condition of chaos
far worse than the partial or local difficulties sought to be
obviated. "Where the precedents are unanimous in sup-
port of a proposition, there is no safety but in a strict ad-
herence to such precedents. If the court will not follow
established rules, rights are sacrificed, and lawyers and
litigants are left in doubt and uncertainty, while there is

Meng v. Coffee.

no certainty in regard to what, upon a given state of facts, the decisions of the court will be. If the common-law rule is inadequate, the proper course is by legislation." MAXWELL, C. J., in *Wilson v. Bumstead,* 12 Nebr., 1, 4.

Not only should the inapplicability of a common-law rule be general, extending to the whole, or the greater part, of the state, or at the least to an area capable of definite judicial ascertainment, to justify the courts in disregarding such rule, but we think, in view of the ease with which legislative alteration and amendment may be had, the power to declare established doctrines of the common law inapplicable should be used somewhat sparingly. In the whole course of decision in Nebraska, from the territorial courts to the present, this power has been exercised but three times: (1) with reference to trespass upon wild lands by cattle (*Delancy v. Errickson,* 10 Nebr., 492, 35 Am. Rep., 487), restricted, however, to wild lands by later adjudications (*Lorance v. Hillyer,* 57 Nebr., 266) ; (2) with reference to the effect of covenants to pay rent in a lease after destruction of leased buildings, dissented from, however, by three* of the six judges (*Wattles v. South Omaha Ice & Coal Co.,* 50 Nebr., 251, 36 L. R. A., 424, 61 Am. St. Rep., 554) ; and (3) with reference to estates by entirety (*Kerner v. McDonald,* 60 Nebr., 663, 83 Am. St. Rep., 550). Of these three cases it may be remarked that the first was in line with legislation which clearly ran counter to the common-law rule, and that the other two dealt with strict feudal rules of property, based on conceptions long since become obsolete. The recent holdings as to the statute of uses (*Farmers & Merchants' Ins. Co. v. Jensen,* 58 Nebr., 522), and the statute of Elizabeth concerning charitable uses (*St. James Orphan Asylum v. Shelby,*† 60 Nebr., 796), are of different nature. In the statute of uses the court did not have to do with a rule of the common law, but with an English statute, which was not adjustable to our own legislation as to convey-

---

* POST, C. J., IRVINE and RYAN, CC. IRVINE delivered the dissenting opinion.

† This case appears in 84 N. W. Rep., 273, as *In re Creighton's Estate.*

ances. In the statute of Elizabeth relating to charitable uses the court was again dealing with an English statute, and as that statute gave extrajudicial powers to the courts, which they could not exercise under our constitution, the question was one of legislative superseding of the rule, not of inapplicability. Thus the distinction between the case at bar and those in which common-law rules or English statutes have been set aside is readily apparent. Here we are confronted with no legislation to the contrary, nor are we dealing with an antiquated rule of feudal origin, but with an enlightened system of rules, founded on obvious principles of justice, and concededly applicable to the general conditions of the country and to the greater part of this state. Moreover, in each of the three cases in which common-law rules have been held inapplicable there was a complete rule at hand to take the place of the one rejected, and no complicated and extensive judicial legislation was required. In the case of trespasses by cattle, the herd law was on the statute books; the rule as to the effect of covenants in a lease to pay rent was an isolated rule, without collateral consequences, and the obvious and well-settled principle of apportionment, governing all agreements, was available in its stead; and the doctrine of tenancy by the entirety stood alone, unconnected with any general body of rules, and all cases that might have been governed by it were readily referable to the rules governing tenancy in common. In like manner, with the statute of uses removed, we had a complete statutory system of conveyancing, and in the absence of the statute of charitable uses, there were still the general equitable powers of the court of chancery existing anterior to that statute. But while in those cases a single rule, part of no general system of modern application, was rejected, here the rules assailed are results of a general doctrine and part of a complete system, and to overthrow them would leave the whole body of the law of waters unsettled and confused. The subject calls for legislative, not for judicial, action. Black's Pomeroy, Water Rights, secs. 162, 163.

Meng v. Coffee.

Nor do we believe that the common-law rule of equality among riparian owners, administered liberally with respect to the circumstances of particular localities, is necessarily prohibitive of irrigation anywhere. If we bear in mind wherein the essential doctrine of the common law on this subject consists, we doubt whether a more equitable starting point for a system of irrigation law may be found; and we are not alone in this view. Black's Pomeroy, Water Rights, sec. 163. But if the existence of a rule better applicable to parts of the state were of itself sufficient ground for judicial overturning of the law, the question would arise, what principle are we to adopt? The one for which counsel contend, and the only one that could be contended for seriously, is the doctrine of appropriation, and, believing that to adopt this doctrine by judicial legislation in place of the rules of the common law would lead to difficulties in other parts of this state no less great than those charged to the rules at present sanctioned, we purpose to review briefly its history and some of its incidents. The history of this doctrine is well known and has often been set forth. Black's Pomeroy, Water Rights, secs. 11-24; 17 Am. & Eng. Ency. Law [2d ed.], 494; *Atchison v. Peterson,* 20 Wall. [U. S.], 507, 22 L. Ed., 414. It arose in California at a time when government and law were not yet established, when there was no agricultural population and were no riparian owners, and when streams could be put to no use except for mining. From the necessities of the case, there being no law applicable, the miners held meetings in each district or locality and adopted regulations by which they agreed to be governed. As at that time streams could be put to no use except for mining, and as the use of large quantities of water was essential to mining operations, it became settled as one of the mining customs or regulations that the right to a definite quantity of water and to divert it from streams or lakes, could be acquired by prior appropriation. This custom acquired strength; rights were gained under it and investments made and it was soon approved by the courts

and by local legislation; and, though not originally available against the general government or its patentees, was made so available by act of congress in 1866.[*] But it was only the same rule as that by which possession of mining claims was recognized. It was a custom intended to prevent disorder and forcible dispossession of those who had located mines. As stated by Field, J., in *Atchison v. Peterson, supra* (p. 510) : "By the custom which has obtained among miners in the Pacific states and territories, where mining for the precious metals is had on the public lands of the United States, the first appropriator of mines, whether in placers, veins, or lodes, or of waters in the streams on such lands for mining purposes, is held to have a better right than others to work the mines or use the waters." In other words, the doctrine in question was not formulated as an enlightened attempt to adjust the conflicting relations of a large community of individuals. It was a crude attempt to preserve order and the general peace, and to settle customary rights among a body of men subject to no law, under which so many and so valuable rights arose that when the law stepped in it was obliged to recognize them. In this way the rule of appropriation became established in the Pacific states, in opposition to the common law, with reference to streams or bodies of water which wholly ran through or were situated upon the public lands of the United States. Black's Pomeroy, Water Rights, sec. 15. These rules, however, were confined to the public lands, and are so confined at the present time in California, Oregon and Washington. In other states and territories the new doctrine was given general application; sometimes by judicial decision, as in Nevada, but chiefly by constitutional or legislative enactment. Thus, in those states of which the whole or a portion is arid, we now find some in which the common-law rules are in force—California, Oregon, Washington, Montana, North Dakota and, substantially, Texas—though in many of these, for reasons stated, the other rule obtains

[*] 2 U. S. Compiled Statutes (1901), p. 1437.

upon the public lands of the United States; others in which the doctrine of prior appropriation is in general force—Nevada, Arizona, Colorado, Idaho, Utah, Wyoming. Of these, however, Colorado, Idaho and Wyoming have constitutional provisions declaring such to be the paramount law, and in the other jurisdictions named it is generally established by statute. Not only does the history of the rule obviously remove our state from its operation, but a mere comparison of the jurisdictions where the contending principles are in force is very suggestive. In all states which, like our own, are but partially arid, the common law is in force. The states holding to the contrary rule are wholly within the arid regions. Moreover, whereas in those states and some of the partially arid, the arid regions were first settled, and rights, customs and legislation grew up and were shaped with reference to such conditions, with us the amply watered regions of the eastern portion of the state were first settled, and our laws, legislation and lines of judicial decisions were fixed before agriculture in the arid or semiarid portions of the state was at all established. Not only does this suggest that the appropriation doctrine unregulated by minute legislation is unsuited and inapplicable to the state as a whole, but a consideration of some of its incidents will make such conclusion manifest. Under such doctrine the first appropriator may appropriate the entire flow of a stream, if used in proper irrigation. *Hammond v. Rose,* 11 Colo., 524, 19 Pac. Rep., 466, 7 Am. St. Rep., 258; *Drake v. Earhart,* 2 Idaho, 716. Also a nonriparian may appropriate and get an exclusive right to the whole water of a stream for nonriparian lands. *Hammond v. Rose, supra.* It must be clear that such rules are not applicable to this state at large. Land along streams has been bought and sold and titles have been acquired for many years throughout the older portions of the state in reliance upon the rights and advantages incident to ownership of riparian property. The application of the rules of the common law in this state having been undoubted so long, the results of sud-

denly overturning them and permitting the first comers to get all the water from the several streams in the older parts of the state by mere appropriation and turn whole streams upon nonriparian tracts, would be intolerable. Not only have these rules been relied upon in the acquisition and disposition of property, but they have received legislative recognition. Section 8, chapter 57, Compiled Statutes (Annotated Statutes, sec. 7307), providing for ascertainment of damage to lower owners by retention of water in mill ponds; section 32, article 3, chapter 93a, Compiled Statutes (Annotated Statutes, sec. 6854); section 6, article 1, chapter 93a, Compiled Statutes (Annotated Statutes, sec. 6752); and perhaps section 43, article 2 (Annotated Statutes, sec. 6797), of the last-named chapter—indicate an understanding that riparian owners have rights which must be respected and may only be divested by due process of law. Counsel contend that the irrigation act of 1877 "looked on the law of riparian rights with disapproval." But this statement, already sufficiently refuted in the opinion in *Crawford Co. v. Hathaway*, 60 Nebr., 754, is based upon the fallacious assumption that any taking of water from a flowing stream is an infraction of riparian rights.

For the reasons indicated, we are of opinion that the former holdings of the court must be adhered to, and that, except as altered by statutes, the common-law rules are in force in every part of the state. The details of such rules with respect to irrigation, however, and their application to irrigation in the semiarid portions of the state, have not as yet received careful consideration by this court. It is generally recognized that at common law a riparian owner may take water from a stream for purposes of irrigation. *Embrey v. Owen*, 6 Exch. [Eng.], *353; *Elliot v. Fitchburg R. Co.*, 10 Cush. [Mass.], 191, 57 Am. Dec., 85; *Gillett v. Johnson*, 30 Conn., 180; *Ulbricht v. Eufaula Water Co.*, 86 Ala., 587, 6 So. Rep., 78, 4 L. R. A., 572, 11 Am. St. Rep., 72; Gould, Waters [3d ed.], sec. 217. At an early day there was a tendency to class irrigation

among those uses of a stream which might be carried even to entire consumption of its waters. But another view has long prevailed and is now well established, not only in the eastern portion of the country, but even in the arid and semiarid states (so far as such states recognize the common-law doctrine as to riparian rights), to the effect that irrigation is one of those uses which must be exercised reasonably, with a due regard to the rights of others. *Low v. Schaffer*, 24 Ore., 239, 33 Pac. Rep., 678; *Gillett v. Johnson*, 30 Conn., 180; Black's Pomeroy, Water Rights, sec. 151; Gould, Waters [3d ed.], secs. 205, 217. This subject has been confused needlessly by the unfortunate use of the words "natural" and "ordinary" in this connection to distinguish those uses which the common law does not attempt to limit, and "artificial" or "extraordinary" to designate those which are required to be exercised within reasonable bounds. It is no doubt true that irrigation is a very natural and a very ordinary want, and that use of a stream for such purpose is natural and ordinary in semiarid regions. But such is not the question. The law does not regard the needs and desires of the person taking the water solely to the exclusion of all other riparian proprietors, but looks rather to the natural effect of his use of the water upon the stream and the equal rights of others therein. The true distinction appears to lie between those modes of use which ordinarily involve the taking of small quantities and but little interference with the stream, such as drinking and other household purposes, and those which necessarily involve the taking or diversion of large quantities and a considerable interference with its ordinary course and flow, such as manufacturing purposes. The purpose of the law is to secure equality in the use of the water by riparian owners, as near as may be, by requiring each to exercise his rights reasonably and with due regard to the right of other riparian owners to apply the water to the same or to other purposes. This purpose is not subserved by any arbitrary classification, and in regions where water must be carefully husbanded and is in great

**39**

demand for agricultural purposes, it is obviously better to incline towards such a rule as will further equality and a wide participation in the benefits of a stream. *Lux v. Haggin,* 69 Cal., 255. Accordingly, wherever the common-law rules as to riparian rights apply, even in the arid portions of the country, the weight of authority places irrigation among those uses of a stream which must be exercised reasonably under the circumstances of each case. *Union Mill & Mining Co. v. Ferris,* 2 Saw. [U. S. C. C.], 176, Fed. Cas. No. 14,371; *Union Mill & Mining Co. v. Dangberg,* 2 Saw. [U. S.], 450, Fed. Cas. No. 14,370; *Smith v. Corbit,* 116 Cal., 587; *Baker v. Brown,* 55 Tex., 377; *Trambley v. Luterman,* 6 N. Mex., 15; 17 Am. & Eng. Ency. Law [2d ed.], 487; Black's Pomeroy, Water Rights, sec. 151. This conclusion is not altered, so far as concerns the case at bar, by section 65, article 2, chapter 93a, Compiled Statutes (Annotated Statutes, sec. 6819), which declares water for irrigation to be a "natural want." If that section was meant to enact a new rule, we have here a cause which arose two years prior to its adoption. If it was meant to be declaratory, we must consider it in connection with section 43, which says that domestic uses must come before agricultural uses, and is inconsistent with any construction that would allow complete diversion of a whole stream for irrigation as against those who desire to use its water for domestic purposes. It would doubtless be impolitic to give an arbitrary or hard and fast meaning to the word "reasonable" in this connection. The use of water for irrigation always involves some loss, and we do not think it would be wise to declare every perceptible diminution of the waters of a stream to be unreasonable. The necessity of a liberal view of what constitutes a reasonable use of water for irrigation has been judicially recognized (*Harris v. Harrison,* 93 Cal., 676; *Bathgate v. Irvine,* 126 Cal., 135, 77 Am. St. Rep., 158), and we think caution in that respect entirely proper. If the rights of the upper owner in the water are no more than those of the lower owner, they are at the same time

Meng v. Coffee.

no less. His right to reasonable use of the water for irrigation ought not to be rendered nugatory by requiring it to be exercised in an impossible manner. We do not think this conflicts with what was said in *Clark v. Cambridge & Arapahoe Irrigation & Improvement Co.,* 45 Nebr., 798, and reaffirmed in *Slattery v. Harley,* 58 Nebr., 575, since the court was there considering only whether the common-law rules were in force, not the definition of the reasonable use allowed by those rules as applied to sections of the state shown by pleadings and proofs to be arid. Nor does it conflict with the holding in *Crawford Co. v. Hathaway,* 60 Nebr., 754, hereinbefore reiterated, to the effect that the common-law rules apply in every part of the state. For, if we regard the question of what is reasonable use as in great part one of fact, the conditions of soil, climate, and rainfall in any given locality, when proved, may be considered properly as important elements of fact, without in the least affecting the general rule. But if we concede so much, the law insists that the lower owner shall not be deprived of the use of the water to an unreasonable extent. *Sampson v. Hoddinott,* 1 C. B., n. s. [Eng.], 590. The uses which an upper riparian owner may make of a stream for purposes of irrigation must be judged, in determining whether they are reasonable, with reference to the size, situation and character of the stream, the uses to which its waters may be put by other riparian owners, the season of the year, and the nature of the region. These circumstances differ in different cases, and what use is reasonable must be largely a question of fact in each case. *Lux v. Haggin,* 69 Cal., 255; *Baker v. Brown,* 55 Tex., 377; *Harris v. Harrison,* 93 Cal., 676; *Minnesota Loan & Trust Co. v. St. Anthony Falls Water-Power Co.,* 82 Minn., 505, 85 N. W. Rep., 520; *Embrey v. Owen,* 6 Ex. [Eng.], *353; *Pitts v. Lancaster Mills,* 13 Met. [Mass.], 156. Some things, however, are clearly unreasonable, and it may be laid down absolutely that the upper owner, in using the water for irrigation, must not waste, needlessly diminish, or wholly consume it, to the injury of other

owners, nor so as to prevent reasonable use of it by them also. *Union Mill & Mining Co. v. Dangberg*, 2 Saw. [U. S. C. C.], 450, Fed. Cas. No. 14,370; *Lux v. Haggin*, 69 Cal., 255; *Harris v. Harrison*, 93 Cal., 676; *Gould v. Eaton*, 117 Cal., 539, 38 L. R. A., 181; *Coffman v. Robbins*, 8 Ore., 278; *Gillett v. Johnson*, 30 Conn., 180.

Judged in this way, we think the use made of the streams in question by three of the defendants may not be said to be reasonable. Hat creek is a small stream, about ten feet wide where it passes the plaintiff's lands, formed by the junction of a number of similar streams a few miles above. Of these, Warbonnet creek, after gathering in several small tributaries, flows into Munroe creek, which is received by Sowbelly creek, and the latter soon joins Hat creek, into which, some distance above, a number of smaller streams have been united. All of these creeks are fed by springs in the hills and flow the year round, although at times somewhat reduced in volume in dry weather. There is some conflict in the testimony as to the disposition of the water diverted by the several defendants, and how far it or some of it may return to the creeks. The most satisfactory testimony is that of the county surveyor, and we have looked chiefly to his statements for an understanding of the facts. The defendant Brewster maintains a dam on Warbonnet creek, and a ditch, by means of which he irrigates some 300 acres. The capacity of this ditch is sufficient to contain the entire stream. It takes the water away from the creek to a point about a mile off, where the dip is but very slightly toward the creek, and there discharges it, so that practically all that is not used in irrigation will, in hot weather, evaporate, and not return to the creek. On one occasion, when the season was very dry in that vicinity, and a number of Mr. Brewster's neighbors below him were complaining because they could get no water, it appears that he was turning the water upon a meadow of 80 to 100 acres so that it stood there from one to one and one-half inches deep; and, as we have seen, what was not used was sub-

stantially wasted. This is obviously unreasonable. The defendant Wilcox maintains a ditch on Munroe creek, with which he irrigates 150 acres. This ditch also is sufficient to carry the whole stream, and the water is so discharged that none gets back into the creek, since the ground slopes in another direction at the point of discharge. With respect to the defendant Coffee, who maintains a ditch on Hat creek, with which he irrigates 160 acres, the case is not so clear. But at the time the writs were served in this case, while there was abundance of water in his ditch, the sheriff found the creek dry a mile and a half below, and the bed of the creek opposite the plaintiff was so dry that dust blew in it. It is claimed that the character of the creek bed and nature of the soil in that vicinity, shown by the testimony to be close to the "bad lands," at an altitude of 4,500 feet, in an arid region, is such that in a dry season the waters of the creek would evaporate or be absorbed in the ordinary course of things before they reached the plaintiff. This, if true, would be a strong circumstance to consider in determining what would be a reasonable use of the water. *Union Mill & Mining Co. v. Dangberg,* 2 Saw. [U. S. C. C.], 450, 459, Fed. Cas. No. 14,370. But a large number of witnesses, well acquainted with the neighborhood, deny this, and the fact that in a former very dry season plaintiff had had water except for two or three days, and that as soon as the injunction was served, water flowed several inches deeper than usual past his land, would indicate that the condition of the creek when suit was brought was due to complete diversion of its waters by the dam above. With respect to the defendant Steele, however, who is on Middle Hat creek, above Coffee, the evidence is that all of the water taken out by him, except what is consumed by evaporation, goes back to the creek, and there is no evidence of unreasonable use or of injury to the plaintiff.

The further claim of the defendants, based upon section 2339 of the Revised Statutes of the United States [U. S. Compiled Statutes, 1901, p. 1437], so far as such sec-

tion is relied upon in connection with the legislation of this state to set up rules at variance with the doctrines of the common law, is disposed of adversely in *Crawford Co. v. Hathaway,* 61 Nebr., 317. But they also contend that by virtue of said section as prior appropriators who have duly entered and received patents to their lands, they are entitled to take the waters of said streams as against the plaintiff, who is a subsequent patentee from the government. The section in question has been construed repeatedly by the federal courts, and its meaning is not open to question. *Basey v. Gallagher,* 20 Wall. [U. S.], 670, 22 L. Ed., 452; *Broder v. Natoma Water & Mining Co.,* 101 U. S., 274, 25 L. Ed., 790; *Jennison v. Kirk,* 98 U. S., 453, 25 L. Ed., 240. In *Jennison v. Kirk,* the court says (p. 460) : "In other words, the United States by the section said that whenever rights to the use of water by priority of possession had become vested, and were recognized by the local customs, laws, and decisions of the courts, the owners and possessors should be protected in them," although the title to the lands might be in the government. In *Basey v. Gallagher* it is said (p. 683) : "It is very evident that congress intended, although the language used is not happy, to recognize as valid the customary law with respect to the use of water which had grown up among the occupants of the public land under the peculiar necessities of their condition; and that law may be shown by evidence of the local customs, or by the legislation of the state or territory, or the decisions of the courts. The union of the three conditions in any particular case is not essential to the perfection of the right by priority; and in case of conflict between a local custom and a statutory regulation, the latter, as of superior authority, must necessarily control." In the Pacific and mining states, appropriation of water by squatters on the public land became the subject of legislation and judicial decision very early in the history of those communities, whereby customs that had grown up and come to be well-defined, widely recognized, and generally respected in the regions in question were

given legal force.   Irrigation is very young in this state, as the semiarid portions did not begin to be settled till about 1880.   Neither by legislation nor by judicial decision had appropriation of water been recognized in this state as conferring any right until the statutory period of prescription had elapsed.   Nor had any such general, well-recognized or widely respected custom grown up in this state as to justify the application of the federal statute thereto.   The customs in the states to which congress had reference were wide-spread and notorious.  The custom attempted to be proved in this case was at best very confined in its limits, known to few, admitted by few, and as the testimony shows, often disputed.   The defendants testify that they began taking the water "by squatter's right."   One witness says that in 1880 and 1881 it was usual for every man in northwestern Nebraska to "take what water he could."   Others testify that at that time no one respected any other's rights in this regard, but each put in a ditch wherever he could.   Another says: "About all the rule there was, if a man went and took out a ditch, he went and took it out."   There is some testimony of a custom of respecting prior appropriations.   But the weight of the evidence is to the effect that there were very few settlers, and all took what was at hand, without regulation or custom of any sort.   Hence we do not think use of the water under such circumstances for a less period than ten years operated to give any right to the defendants as against the plaintiff under the section in question. On the other hand, however, we are of the opinion that under that section the period during which the defendants maintained their ditches as squatters, and afterwards under homestead entries, prior to obtaining patents for their land, may be counted by them in making out the statutory period of prescription as against the plaintiff, a subsequent patentee from the government.   The statute has been construed to be a recognition by the government of all claims which might accrue to such squatters as against other settlers, and to intend that all patents which might

issue should be subject to such rights. As a right began to accrue as soon as the ditches were dug, we think the period during which the defendants appropriated water "by squatter's right," while giving rise to no rights against the government, is available in proving rights by prescription against the plaintiff. *Tolman v. Casey,* 15 Ore., 83.

This brings us to the last claim made by the defendants, namely, that they are entitled to divert the water of the several streams in question by virtue of ten years' adverse user. We may leave the defendant Steele out of account, because, as has been seen, the evidence does not show that his use of the water is unreasonable. Likewise the defendant Wilcox may be dismissed with a few words, since his dam was not built till 1884, and his ditch as it now stands was not dug till 1886. As this suit was begun in 1893, he can claim nothing by prescription. The defendant Brewster put in his dam in 1879 or 1880, and though he made some enlargements, his system of irrigation seems to have been in existence in its present condition for ten years before the bringing of this action. As to Coffee's ditch, the testimony is conflicting. It was begun in 1881, but seems to have been added to several times, and there is testimony that it was enlarged as late as 1886. But we need not review the testimony on this point, because, conceding that his ditch was in its present form ten years prior to the bringing of this action, neither he nor the defendant Brewster has proved a right to consume all the water of the streams by prescription. The plaintiff settled upon his land in 1886, five years after Coffee began his ditch, and from that time until 1893 there is abundant evidence that he had water in the creek at all times except for a day or two in 1890. No right to divert and dissipate the whole stream was acquired by making such use thereof as would still leave water for the plaintiff. So long as the water was sufficient for all, there was no adverse user. *Anaheim Water Co. v. Semi-Tropic Water Co.,* 64 Cal., 185; *Bathgate v. Irvine,* 126 Cal., 135, 77 Am. St. Rep., 158; *North Powder Milling Co. v. Coughanour,* 34 Ore., 9;

*Church v. Stillwell,* 12 Colo. App., 43; *Egan v. Estrada,* 56 Pac. Rep. [Ariz.], 721. One of the elements to be considered in determining what is a reasonable use of the water of a stream, is the season of the year, and its effect upon the stream. Riparian owners are not to be debarred from use of water because the season is dry and the stream low. But at such time they must take care "to do no material injury to the common right of plaintiff, having regard to the then stage of the river." *Union Mill & Mining Co. v. Dangberg,* 2 Saw. [U. S. C. C.], 450, 458, Fed. Cas. No. 14,370. The testimony is that the season of 1893 was unusually dry. Hence what might have been a reasonable use of the water, or at least such use as gave the plaintiff no ground of complaint, in other years, became highly unreasonable when it had the effect of giving Coffee and Brewster all the water and leaving none for other owners. Only a continuous and adverse user of the whole stream could give a right to take out a greater proportion of such water as was in the stream at the time than they had habitually taken in former years.

It is therefore recommended that the decree be affirmed as to the defendant Steele, but reversed as to the defendants Coffee, Brewster and Wilcox, with directions to make new and further findings of fact in conformity with this opinion, and to enter a decree enjoining the defendant Wilcox from wasting or unreasonably diminishing the waters of Monroe creek, and enjoining the defendants Brewster and Coffee from consuming all the waters of Warbonnet and Hat creeks, respectively, in the irrigation of their lands, or permanently diverting in any year a greater proportion of the water in such streams for the time being than they were accustomed to take out prior to the summer of 1893, having regard to the nature of the season and the condition of the stream at the time. In consequence, however, of the long time that has elapsed since the trial, we think it would be entirely proper to take further evidence upon the question of the amount of water

which such defendants may divert, should the lower court so desire.

SEDGWICK, C., concurs.

OLDHAM, C., having been of counsel in *Crawford Co. v. Hathaway**, did not sit.

By the Court: For the reasons set forth in the foregoing opinion, the decree of the district court is affirmed as to the defendant Steele, but reversed as to the defendants Coffee, Brewster and Wilcox, with directions to make new and further findings of fact in conformity with said opinion, and to enter a decree enjoining the defendant Wilcox from wasting or unreasonably diminishing the waters of Munroe creek, and enjoining the defendants Brewster and Coffee from consuming all the waters of Warbonnet and Hat creeks, respectively, in the irrigation of their lands, or permanently diverting in any year a greater proportion of the water in such streams for the time being than they were accustomed to take out prior to 1893, having regard to the nature of the season and the condition of the stream at the time; that proportion and other questions of fact necessary to the rendition of such a decree to be ascertained from the evidence already taken or by taking further evidence at the discretion of the district court.

JUDGMENT ACCORDINGLY.

NOTE.—*Riparian Ownership as Between States—Islands—Kentucky and Missouri—Delaware and New Jersey—Victoria and New South Wales.*—The reader is referred to volume 65 of the Nebraska Reports, pp. 154, 156; to *Missouri v. Kentucky,* 11 Wall, [U. S.], 395; to *Long v. Olsen,* 63 Nebr., 327; and to the forthcoming decision in the suit between New Jersey and Delaware, now pending before the supreme court of the United States in its original jurisdiction.

*Pental Island.*—The colony of Victoria was separated from New South Wales by the Australian Constitutions Act of 1850, and the course of the Murray river fixed as its northern boundary. This river was navigable, and at that time the principal avenue of transit and commerce to and from the interior. The jurisdiction in the boundary

* 60 Nebr., 754.

river not being clearly defined by the original act, an imperial act five years later declared that the course of the River Murray lying between the two colonies should form part of the territory of New South Wales. 18 & 19 Vict., ch. 54, A. D. 1855. This would appear to have settled the controversy for all time. But it afterwards developed that at one point in its course the River Murray passed along the northern side of a strip of land about fifteen miles in length, with an average breadth of two miles. This strip was constituted an island by the fact that on its southern side it was bounded by a channel which connected with the Murray at both ends. There was a constant flow of water in both channels, and the southern stream was deep enough for navigation during a greater part of the year. But owing to the obstruction of bridges, the northern channel only was used for navigation. The island was claimed by both colonies; by New South Wales on the ground that both streams were the watercourse of the Murray, by Victoria on the ground that the northern stream alone was the Murray, the southern channel being formed by the action of the Loddon, a Victorian river which is tributary to the Murray, and has the appearance on the map of entering the latter by two mouths, which is, probably, not a physical fact. The colonies supported their respective claims by arguments drawn (1) from the natural features of the country, (2) the history of its exploration and settlement, (3) its political and legal history, and (4) reputation.

The question of the exercise of jurisdiction came up before the executive council in 1852, in reference to collecting customs duties on goods coming up the river through South Australia. The imperial act was passed in consequence of this.

The arguments and proofs before the judicial committee as to the jurisdiction, were on the respective parts as follows, that is to say:

*Victoria* showed that the course of the Murray was marked by a line of trees, while the course of the Loddon was treeless, and that these features marked the northern and southern channels, respectively.

*New South Wales* pointed out that the juncture of the Loddon with the southern channel was below the point where that channel left the Murray, and that the southern channel was in constant flow while the Loddon was frequently dry.

*Victoria* answered that the southern channel above the junction of the Loddon was a course forced by floods, which were so common that for a part of most years the greater part of Pental Island was under water.

*New South Wales*: The question as to what was the course of the Murray was not a question of interpretation of a statute, but of indentifying the object described.

*Victoria:* Even if physical geography is against us, the true question is not what an elaborate investigation by experts may show to be the relation of the two streams, but what was meant by those who used the description; and this is to be proved by evidence of

knowledge and reputation. The northern stream, at the enactment of the statute, had always been known as the Murray, while the southern stream was spoken of by various names, as Murrabit, Murrabeet, Murrabout, et cætera.

*New South Wales:* We deem this unimportant. If the stream is actually a part of the Murray, simply calling it by another name does not make it another river.

The question was this: Shall the statute be interpreted by physical geography or by the common and ordinary interpretation of the language of the parliamentary enactment?

The case was closed by an order in council dated August 9, 1872, which, after reciting the reference and the report of the judicial committee thereon, awarded Pental Island to Victoria. *Roma locuta, causa finita.* Law Quarterly Review, vol. 20, p. 236, article by Prof. Moore, University of Melbourne.

When a river is the boundary between two nations or states, if the original proprietor is neither, and there be no convention respecting it, each holds to the middle of the stream. But when one state is the original proprietor, and grants the territory on one side only, it retains the river within its own domain, and the newly erected state extends to the river only, and the low water mark is its boundary. *Handly's Lessee v. Anthony,* 5 Wheat. [U. S.], *374; *Howard v. Ingersoll,* 13 How. [U. S.], 380. *Alabama v. Georgia,* 23 How. [U. S.], 505, is frequently cited as maintaining the same doctrine. But it is a different question, to wit: *Was there an implication in the language of the contract of cession between the United States and Georgia?* In *Fleming v. ˈ;nney,* 4 J. J. Marsh. [Ky.], 156, the first proposition laid down in *.andly's Lessee v. Anthony, supra,* is followed.—W. F. B.