THOMAS *v.* LACOTTS.

5-31                                     257 S. W. 2d 936

Opinion delivered May 18, 1953.

Rehearing denied June 8, 1953.

*Botts & Botts,* for appellant.

*House, Moses & Holmes* and *E. B. Dillon, Jr.,* for appellee.

GRIFFIN SMITH, Chief Justice. The pleadings are voluminous. Appellant's abstract, brief, and his reply brief cover more than 650 pages.

Mill Bayou, or Mill Creek Bayou—as the sluggish waters are referred to by interchangeable terms—separates the LaCotts property from more than 2,500 acres

owned by Thomas. A large part of Thomas' land is adapted to farming and some is suited to rice growing, but duck-shooting privileges form a substantial part of his income.

Appellant asserts ownership of the east half of section three, township five south, range four west, in Arkansas county, and he has other lands, ''adjoining and surrounding this tract.'' The LaCotts property is immediately west of the 2,500 acres upon which five artificial reservoirs were constructed by Thomas at a cost of about $40,000.

The bayou enters the LaCotts land from the north, flows south a short distance, makes a horseshoe bend in turning east, then continues south in a relatively straight course appreciably west of the line dividing Thomas from LaCotts. It then wends east by south to a point on LaCotts' land not far from the boundary between the disputants. Here LaCotts constructed a dam and levee. The dam was of sufficient height to obstruct the natural flowage, thus diverting the waters to a low wooded area on LaCotts' property used for duck-shooting during the open season and as a natural feeding range at other times.

Without the dam, bayou overflowage inundated the LaCotts property during the wet season; also when upper proprietors flooded their rice fields excess waters reached the bayou through canals or tributaries. But during the dry season water movement southward was controlled by a series of levees. There is no record of protests by proprietors south of the lands here involved, although Thomas had effectively built dams and levees that are said to have had the effect of retarding flowage.

A short distance below the LaCotts dam and at a point admittedly on Thomas' land, appellant (Thomas) dug a canal, extending northeast. There is evidence that the depth of this canal is equal to or on a level with the bed of the bayou where its southwestern terminus connects with the stream. At the northeastern end a so-called ''relift'' has been operated for many years. This

consists of a large pump capable of transferring ten to fifteen thousand gallons of water per minute from the canal to the inter-connected reservoirs owned by Thomas.

It is contended by LaCotts that the dam built by Thomas a short distance below the relift canal and a second dam built by Thomas farther south and east caused out-of-season overflows affecting woodlands, hence growth of certain trees was stunted and others were killed. There is also an inference that when the relift pump was operated at normal speed during low water the tendency toward depletion drew water down the bayou and into the canal more rapidly than normal action of the stream. This had the effect of accelerating bayou flowage, thus "drawing" water from above the canal entrance and upper reaches of the bayou, to the injury of LaCotts.

Appellant says in his statement that for fifteen or twenty years he has been making reasonable use of a portion of bayou water for agricultural purposes, although admittedly the artificial reservoirs, which cover approximately 500 acres, are also used for duck-shooting purposes. LaCotts undertook to lease some of the wild land from Thomas, but the latter explained that he had contracts with a dozen or more sportsmen at DeWitt to whom shooting rights had been let on a paying basis. Shortly thereafter appellant says he observed that the natural flow in Mill Bayou was not reaching his canal as usual. The deficiency was particularly noticeable at the relift where the water was so low that the pump became useless. It was then that Thomas discovered that LaCotts had built the dam now complained of.

It is conceded that the diverted water, after spreading over the LaCotts lands to the west, reëntered the bayou; but this, says Thomas, "was below the farm lands owned by appellant, and below his relift, so that [I] could not make reasonable use of the waters coming down the bayou in its natural course." A further complaint by appellant is that maintenance of the dam (above which appellees' levee extends several hundred

feet) will have the inevitable result of denuding the duck-shooting area leased to the DeWitt sportsmen.

Another justification urged by Thomas for taking the bayou water in large quantities is that the general result, as contrasted with irrigation of rice lands from wells, tends to prevent exhaustion of underground water, the level of which has continued to fall for several years, entailing higher costs for pumping. It is a matter of common knowledge, says appellant, that rice watered from reservoirs or a stagnant source grows better than if served from underground.

Shortly after LaCotts built the dam in 1950 Thomas noticed that less water was flowing down the bayou. He made, or caused to be made, an investigation and found the structures here complained of. For some time thereafter supplies in the artificial ground tanks met appellant's needs, but eventually the reserve water was reduced from 500 to an estimated 100 to 150 acres. Pumps in two irrigation wells were then conditioned. One was operated for 15½ days, the other for a day longer.

In a complaint filed July 20, 1950, Thomas asked the court to restrain the defendants from constructing a levee or dam it was alleged they were then working on; that they be required to remove the dam, and that damages in the sum of $10,000 be assessed because of crop deterioration and other losses.

Appellees' answer is an assertion that the dam was begun in 1949; that plaintiff knew of the construction, or should have known that it was being undertaken—this because Thomas' residence was within three or four hundred yards of the fence along which the work was being done. It was then alleged that the dam (with its southern or southwestern terminus across the bayou) was completed along the east side of the defendants' property, but west of the fence that had for fifteen years been maintained as the boundary line. Construction of the dam, referred to as a culvert, was admitted. This was done to shut off part of the water and permit

it to flow over portions of the southwest quarter belonging to the defendants.

Approximately twenty years before suit was brought the defendants' father purchased the east half of the northwest quarter of the southwest quarter of section three, etc., with the intention of using the property as a duck range. A fence was put up, beginning at the highway north of the land and running a mile south through the center of section three. It was of wire nailed to posts and trees for the express purpose of marking the boundary between the owners of the east and the west half of section three. It was asserted that the fence had been continually maintained. Sometimes it was rebuilt, at other times repaired, and it had been recognized as the line of demarkation.

Separate surveys of this north-south line were made on behalf of appellant and appellees. H. L. Franks was employed by Thomas and Thomas J. Strode by LaCotts. A. E. Heagler also testified for LaCotts regarding intricate topographical structure and flowage matters. Because the surveys made by Franks and Strode varied considerably, diverging at a point not far from the LaCotts culvert and gradually increasing southward, the Chancellor—acting, as he thought, with full approval of the litigants—directed St. George Richardson, of Memphis, to make an independent survey. The court's order was that none of the interested persons should be with Richardson. Through a misunderstanding one of the defendants was present part of the time and this is assigned as error.

The Chancellor, in a lengthy written opinion, conceded that he should have entered an order covering this phase of the transaction, but concluded that no harm had been done and overruled the objection. Richardson's survey did not differ materially from Strode's; and, while the Chancellor rejected the defendants' plea of adverse possession and agreed boundary, he accepted as correct the Richardson line. This does not show important variations from the fence, ''as presently existing.'' The record includes photographic exhibits showing clear-

ly defined wire, such as one might expect to find in such an area.

Technical objections are urged against this finding, and it is insisted that the court erred in refusing to permit Fricke to give further testimony. We have often held that the time within which testimony must be presented is a matter of judicial discretion. Here there was no arbitrary determination by the Chancellor, who appears to have patiently considered testimony over a long period of time in a praiseworthy effort to hear and have brought into the record everything of a decisive or contributory character that the parties were entitled to present.

An itemized statement by Thomas showed a cost of $793.04 for operating his well pumps. The Court found that from estimates believed reasonably accurate, each well would produce 1,250 gallons per minute against an average of 10,000 per minute for the relift pump—a ratio of four to one. Thus, taking the view that operation of the pumps cost four times as much as the relift, but that relift costs should be deducted, the net sum was found to be $615.40. We very frankly concede that there is some element of speculation in this result, but the burden of establishing the damage with greater certainty rested upon appellant. To reverse and remand on the ground of speculative conclusions would be a distinct disservice to appellant when costs are considered.

The next consideration relates to appellant's contention that the dam should be removed. After the complaint was filed LaCotts placed the hull of an old steam boiler under the earthwork to allow impounded water to flow in sufficient volume to meet appellant's agricultural demands. The Chancellor found that this contrivance was not on the channel bottom. But in the decree, as distinguished from the opinion, the defendants (appellees here) were restrained ". . . from damming or blocking Mill Bayou so as to prevent the free flow of the water downstream." The effect of this order is, we think, a finding that appellant had not met the burden of proving that the boiler-culvert was elevated to an ex-

tent interfering with sufficient flowage to deprive the lower proprietor of his riparian rights.

To what extent wild duck reserves may share in water apportionable to riparian proprietors is an untilled judicial field in Arkansas. In January, 1940, Mr. Wells A. Hutchins, Irrigation Economist, U. S. Department of Agriculture, delivered an address at Stuttgart in which he discussed water uses and appurtenant legal rights. He is the author of Selected Problems in the Law of Water Rights in the West, and other books dealing with this general subject. His Stuttgart address (preserved by the College of Agriculture, University of Arkansas) contains pertinent suggestions regarding the need of statutory control of water in this state before the problem becomes too complex with growth of population. Two rights were analyzed by Mr. Hutchins: the riparian doctrine and the doctrine of appropriation, the latter being common to many of the western states.

The definition of a watercourse is concisely given in *Boone* v. *Wilson,* 125 Ark. 364, 188 S. W. 1160. The nature and extent of a proprietor's rights are discussed in *Taylor* v. *Rudy,* 99 Ark. 128, 137 S. W. 574. A riparian owner is entitled to the unimpaired natural flow of a stream over his land, but this right is subject to reasonable uses by upper proprietors. *Meriwether Sand & Gravel Co.* v. *State,* 181 Ark. 216, 26 S. W. 2d 57. These rights inhere in the soil and are vested. Our decisions go to the point that under the riparian doctrine no proprietor has priority in the use of water in derogation of another's rights.

In commenting upon these coequal rights Mr. Hutchins presented a chart with examples:—''The use of water on tract 'G' may have begun fifty years ago and may have been continuous, and valuable improvements may have been made which will be seriously [impaired] if the tract is deprived of the use of a substantial part of the stream flow; yet the owner of tract 'E' may begin use today and lawfully demand his share of the flow, with the result that tract 'G' will hereafter be entitled to only a partial use of the stream. The ri-

parian right does not depend upon use and is not lost by nonuse. This is in direct conflict with the appropriative right, which may be declared forfeited if nonuse of the water continues for a period prescribed by statute, and which can be lost instantly by abandonment of the right.''

Appellant contends that the testimony of appellees' witness Heagler contradicts main contention respecting elevations. One of Heagler's charts shows the elevation some distance north of the LaCotts dam to be 171 feet. The LaCotts culvert is not in the center of the bayou channel, and Heagler's testimony is that the water level would have to be about two and a half feet before flowage would occur. However, at the time this witness testified Thomas was not being adversely affected. Elevation below the dam varies from 171 to 174 feet, hence theoretically the water Thomas says by-passed his canal, but re-entered the bayou farther downstream, would seemingly flow back to the relift if not impeded by appellant's own dam. The testimony along this line was not sufficiently developed to form the basis of a definite conclusion.

Final argument against the decree is that error was committed in not allowing damages for crop deterioration. On this point the court said: ''The record, although large, does not reflect the amount of plaintiff's yield for 1949, 1950, or any prior year. These figures could easily have been ascertained and testified to . . . The testimony was also rather vague [as to whether the want of water reduced the prospective yield below preceding years]. . . . Guess-work evidence can never be accepted when definite evidence is available and can be given. This is pure speculation which a court has no business indulging in.''

We are not able to say that the Court's summation of the evidence was erroneous, or that the crop damages claimed by appellant were established by preponderating evidence on a water-shortage basis.

The court assessed each litigant with his own cost, and we affirm this apportionment. The same rule will be applied to appeal costs.

Affirmed.