DEVORE FARMS, INC. *v.* BUTLER HUNTING CLUB, INC.

5-815                                          286 S. W. 2d 491

Opinion delivered January 16, 1956.

[Rehearing denied February 27, 1956.]

*Botts & Botts,* for appellant.

*George E. Pike,* for appellee.

MINOR W. MILLWEE, Associate Justice.  This is a suit by appellant, De Vore Farms, Inc., to restrain appellee, Butler Hunting Club Inc., from maintaining a dam across a bayou which allegedly obstructed the natural flow of said bayou and proper drainage of appellant's lands.  Appellant also alleged that its lands had been rendered valueless for the purpose of growing timber, and damages in the sum of $20,000.00 were asked for merchantable timber already destroyed by reason of the flooding of its lands.

In its answer, appellee admitted maintenance of the dam upon its lands since 1938 but denied that it held water on appellant's lands or that any timber belonging to appellant had been destroyed by reason of the construc-

tion and maintenance of said dam. After an extended hearing the chancellor determined these factual issues in appellee's favor and, in the decree dismissing appellant's complaint, found: "The court finds that the plaintiff has failed to establish by a preponderance of the testimony that the excess water complained of by plaintiff was caused by the act of defendant in constructing and maintaining its dam. The court further finds that the plaintiff has failed to establish by a preponderance of the testimony that damages alleged by the plaintiff were caused by the acts of the defendant.". The sole issue is whether these findings are against the preponderance of the evidence.

Mill Bayou is a shallow, sluggish, non-navigable stream which runs in a southernly direction from a point near Almyra in Arkansas County until it flows into Big Bayou Meto about three miles above the point where that stream empties into the Arkansas River. The bottom lands through which Mill Bayou flows have an average width of about 2,000 feet and are generally lower in elevation than the adjacent countryside. There are approximately 20 dams in the area between Almyra and the point where Mill Bayou flows into Big Bayou Meto and the bottom lands are used primarily for duck hunting purposes and are unsuitable for general farming purposes.

Appellee is a Mississippi corporation licensed to do business in Arkansas and owns 600 acres in Arkansas County which it uses primarily for duck hunting purposes. Mill Bayou runs south through the 600-acre tract near its center. Appellant is an Arkansas corporation engaged in farming operations consisting of the growth of cattle, rice and oats. It owns 780 acres which it purchased in 1937. About one-half of said tract lies west of and adjacent to appellee's land and the other one-half lies northwest of appellee's lands. Mill Bayou traverses only a small portion of appellant's lands on the northeast corner and before it enters lands belonging to others which lie between the lands of the parties. Appellant's lands lie immediately below Bullock's Levee which is on a county highway that crosses Mill Bayou on the extreme northeast corner of appellant's land.

In 1939 appellee constructed a dam, or levee, along and just above the south line of its lands. The dam is about 2,000 feet long and begins at a point west of Mill Bayou and runs east across the main channel of the bayou and over the bottom lands east of the bayou. A drain pipe and floodgate were originally installed in the dam to control the water level but were abandoned in 1940 making the dam solid to the east end where the water flowed through a natural spillway between the end of the dam and higher ground further east. In the spring of 1953, a section of the east end of the dam 140 feet long washed out. In August, 1953, appellee replaced the washed out section by extending it in a northeasterly direction instead of due east as the original section ran. Appellant then filed the instant suit on November 28, 1953.

In an effort to sustain the allegations of its complaint, appellant introduced the testimony of W. J. and N. J. DeVore, manager and president, respectively, of appellant; also the testimony of Thomas J. Frickie, a consulting engineer, and H. L. Frank, a timber cruiser. Their testimony was generally to the effect that appellee's dam caused water to back upon appellant's bottom lands lying near Mill Bayou and a mile or more northwest of appellee's dam, resulting in the destruction of merchantable timber growing on said lands; and that the spillway of appellee's dam was inadequate to allow proper drainage of appellant's lands particularly after replacement of the east end of the dam in 1953. Other witnesses, who were employed by or tenants of the appellant, testified they had seen water higher on the north side of the dam than on the south side at different times, and had also observed dead timber on appellant's land as well as on other lands along the bayou.

W. J. DeVore testified that a considerable portion of appellant's bottom lands had flooded from year to year for ''quite a while,'' and that the water was getting higher each year. He thought appellee's dam kept water on appellant's land and destroyed its timber; also that the new extension on the east end of the dam was

located on the site of the old spillway, which resulted in water being held higher and longer on appellant's lands than formerly. He stated that he complained when the dam was first constructed but did nothing about it until appellee constructed the new extension without a proper spillway. He admitted the existence of a dam on appellant's land which a former owner built for duck hunting purposes. Although he had wished ''it wasn't there,'' he had done nothing to it except build a fence on it in one place. According to N. J. DeVore, his brother told him sometime after 1938 that too much timber was dying, and he took some water levels to determine the cause of the timber dying but ''dropped the subject'' at that time. He admitted that timber died on appellant's hill lands as well as in the bottoms in 1954 and thought timber died ''a little each year.'' He also said that nobody cleared the lands in Mill Bayou Bottoms for farming purposes, and that said lands were used principally for duck hunting purposes.

Engineer Frickie made a survey in August, 1954 to determine elevations in the spillway area of appellee's dam and at certain points where dead timber was found on appellant's lands. He concluded that the spillway maintained by appellee afforded inadequate drainage to lands to the north, causing the timber to die. He started his survey from a government bench mark two miles northwest of the dam but took no elevations on the east side of the bayou. He thought the present spillway was higher than originally and found neither a depression nor a slough in the present spillway area. He introduced a plat upon which he noted a ''timber damage line'' established by his survey but did not survey the bayou which he thought ran straight as shown on the plat. Based on his assumption that the depression caused by the 1953 washout was a part of the old spillway, he thought that spillway afforded a 40% greater area for drainage and discharge purposes than the new spillway. He admitted the lands in question were normally flooded in the spring and winter months in the absence of a dam and had seen lands in the dam area flooded to an elevation of nearly 15 feet.

H. L. Frank cruised the timber on appellant's lands in November, 1953. On direct examination he testified that he found 68,000 feet of dead timber which he thought had died within three years and would have been worth $15.00 per thousand as green timber. When questioned by the court, he stated that he could not say what percentage of the timber had died within the past three or four years.

In opposition to the foregoing evidence, appellee introduced the testimony of T. J. Strode, County Surveyor of Arkansas County, and engineer John P. Powers, who made an extensive survey of all the lands in question on both sides of the bayou as well as other lands below appellee's dam and including lands in the dam area of Gillette Hunting Club which is located 3¼ miles south of appellee's dam. They took elevations in Mill Bayou and at numerous places over all the lands including the dam and spillway area and bottom lands of the appellant. Detailed plats of the survey were introduced which showed that all the elevations on appellant's lands where dead timber was found were considerably higher than the spillway at the cast end of appellee's dam except in two sloughs and in one of these the dam on appellant's land was holding water in the slough. They started their survey at two government bench marks near the spillway which Frickie did not find. Strode used "Mean Sea Level" while Frickie used "Gulf Sea Level" in establishing elevations, which may have accounted for the slight differences in elevation found by each in the spillway area. Strode found the spillway of the Gillette Hunting Club dam considerably higher than the spillway in appellee's dam and saw water running upstream from the Gillette dam over appellee's dam in August, 1954.

Appellee also introduced evidence of the different elevations of waters held against the floodgate on Big Bayou Meto about 18 miles below appellee's dam over a period of several years as disclosed by records of the U. S. Engineers. According to Strode, these records and the elevations of the Gillette dam definitely show that waters were held on the Gillette and Butler Hunting Club

lands and the lands of appellant by this floodgate for such long periods as to kill the timber on the lands of all three. It was the considered opinion of both Strode and Powers that appellee's dam did not back or hold water on appellant's lands nor contribute to the destruction of timber on said lands. They also testified that appellee's natural spillway was the type ordinarily used in the area with certain advantages over an artificial spillway and was entirely adequate. They also stoutly disputed the testimony of Frickie to the effect that there was no depression or slough in appellee's spillway area and his assumption that the washed out section of the dam was a part of the old spillway. According to Strode, the replacement of the washed out portion in 1953 by extending it in a northeasterly direction increased the width of the spillway area and rendered it more efficient than as originally constructed in 1939.

The testimony of Strode and Powers was corroborated by that of several parties living in the vicinity who owned or farmed lands adjacent to the lands of appellant or lands lying between the lands of the parties. Their testimony was to the effect that water from appellee's dam did not flood either their own lands or those of the appellant; that all the bottom lands were normally flooded every year from January until June; that timber had been dying in the area as long as they could remember; and that the small amount of green timber in the area is unmerchantable.

There is no dispute as to the applicable law. Whether the natural flow or reasonable use doctrine of the riparian theory be applied, it is well settled by our decisions that one riparian owner along a non-navigable stream has no right to obstruct or interfere with the natural course of said stream to the detriment or damage of other riparian owners. *Turner* v. *Smith,* 217 Ark. 441, 231 S. W. 2d 110; *Thomas* v. *La Cotts,* 222 Ark. 171, 257 S. W. 2d 936; *Harris* v. *Brooks,* 225 Ark. 436, 283 S. W. 2d 129. As previously indicated, the question whether the construction and maintenance of the dam by appellee flooded appellant's lands and destroyed its tim-

ber is purely factual. While the testimony on this issue is conflicting, a careful consideration of the entire record convinces us that the surveys and observations by Strode and Powers for appellee were more comprehensive, detailed and perhaps more accurate than those presented by appellant. Their findings were corroborated by other farmers and landowners in the area similarly situated. The chancellor had the advantage over us of hearing and observing the witnesses, and we are unwilling to say his findings are against the preponderance of the evidence.

Affirmed.