MERIWETHER SAND & GRAVEL COMPANY *v.* STATE EX REL. ATTORNEY GENERAL.

Opinion delivered March 3, 1930.

*Ned Stewart, Searcy & Searcy* and *McKay & Smith*, for appellant.

*Hal L. Norwood*, Attorney General, *Walter L. Pope*, Assistant, *R. T. Boulware* and *Guy Amsler*, for appellee.

BUTLER, J. The appellant, some years ago, secured leases on lands underlaid with gravel situated about four or four and a half miles from Bodcaw creek in Lafayette County, Arkansas. The waters from the said lands, in their natural flow by means of depressions, sloughs and

branches, entered said creek at a point above the lands of the appellees, F. M. Shewmake and E. D. Brown. The appellant erected on its leasehold equipment for the mining of the gravel and for washing a part of it so as to separate the sand and other foreign matter therein from the gravel. The gravel mined was sold by the appellant to various persons, a considerable quantity being sold to the Highway Department of the State of Arkansas. A part of the gravel was sold in its natural state as when taken from the pits, some was sold after having been washed, and the sand extracted was also marketed for various purposes. As a part of appellant's equipment, railway tracks were constructed for the purpose of bringing the gravel in its natural state to its washing plant and delivering it at points where it might be transported for use in the building of highways, etc.: A well was sunk from which water was procured. The total amount of money expended by the appellant in erecting and equipping its plant was a large sum. In washing the gravel the detritus held in suspension by the water flowed across the low-lying ground and finally was discharged into Bodcaw creek.

On the 13th day of July, 1929, the State, on relation of the Attorney General (F. M. Shewmake and E. D. Brown joining with it), filed a bill in equity asking that the appellant be permanently enjoined from discharging the washings from its gravel beds into Bodcaw creek—the State on the ground that said creek was a stream in which fish bred and were accustomed to frequent, and that same had been used as a public fishing and outing stream for many years by the citizens of Arkansas, and that the operation of appellant's equipment had rendered the stream unfit for a spawning and breeding ground, and that the fish had been destroyed and driven from its waters; and Shewmake and Brown on the ground that they were owners of a part of the stream, its pools and lakes, and the land adjoining the same for a considerable distance, and that the deposits from the

washing of gravel were filling the stream, that silt and other material were being deposited in increasing quantities and over increasing areas each season over their meadows and farms adjacent to the stream, and that the waters of the stream had been rendered unfit for domestic use or for the use of their horses and other domestic animals, and that their fishing rights in said waters were valuable and had been destroyed.

The appellant filed its motion to strike the cause of action alleged by Shewmake and Brown because, as it said, they were improperly joined with the plaintiff, the State, and also filed a demurrer, which motion and complaint being overruled, defendant answered denying the allegations of the complaint and denying that it had violated any public or private right or encroached upon the property of plaintiffs by doing or omitting to do any act by which commission or omission an injury resulted.

The court heard the testimony on the evidence, which was sharply conflicting, and found the issues in favor of the plaintiffs and rendered a decree holding that the operation of appellant's plant caused "slush, mud and silt to be discharged through natural drainage into the waters of Bodcaw creek which follows through and across the lands belonging to the plaintiffs, Shewmake and Brown, and that by reason of the same the waters of the stream were rendered unfit for domestic use for the watering of their animals and for other purposes, and that such discharge constituted a continuing private and public nuisance, and that appellant ought and should be restrained and enjoined from discharging any further quantities of silt, etc., into said creek or into any stream or drainage that would convey the same into the creek."

For reversal of the decree as to the appellees, Shewmake and Brown, the appellant contends that their several causes of action are barred by the statute of limitation, and for further reason, that they have been guilty of such laches as would bar the relief sought. Appellant further contends that the State is not entitled to the

relief granted; that the damages are shown to be slight, while the relief sought would work great damage to the appellant and great inconvenience and loss to the public; that the relief ought not to have been granted because the operation of appellant's plant was of importance to the State, and that a dangerous precedent would be set by the upholding of the judgment of the court below.

The testimony on the part of the appellant tended to show that the appellees, Shewmake and Brown, were the owners of the lands alleged to have been damaged, and of the stream at and before the time of the erection of the appellant's plant; that they knew of the preparations made by the appellant and of the erection by it of its various equipment, and that it was laying tramroads at great expense, making purchases of gravel *in situ* from the various landowners, and entering into extensive contracts with the State Highway Department and others for furnishing both washed and unwashed gravel; that its plant was erected and operations begun in the year 1925, more than three or four years before the date of the filing of the complaint in this case, and that shortly after the erection the detritus from the washing plant began to make its way down the lower lying lands and branches, and soon began to discolor the waters of the creek, and to load it with quantities of various kinds of earth held in suspension, which gradually, as these substances settled, began to fill the stream and to deposit sediment on adjacent lands. These facts, it is argued, bring the case within the rule announced in *Brown* v. *Arkansas Central Power Co.,* 177 Ark. 1064, and that the appellees' cause of action is barred because of limitation. To this conclusion we cannot assent. In order for the rule announced in the Brown case, *supra,* to apply, the erection of the plant and its operation must have been of such nature that the consequences resulting therefrom could have been known and the damage ascertained and fully compensated at the time the injury first occurred. It is shown by the testimony that the injury to

the stream was progressive in its nature, being greater or less with the recurring seasons. The deposits of mud in the flats were precipitated in greater quantities in times of flood than under normal weather conditions. Therefore, it cannot be said that the full extent of the injury could have been foreseen or the damage ascertained at the time of the beginning of the operations of appellant's plant.

In *Brown* v. *Arkansas Central Power Co., supra,* it is said: "If it was known the damage was probable, or even though some damage was certain, the nature and extent of that damage could not be reasonably known and fairly estimated, but would be speculative and conjectural," then the rule announced by the court as applicable to the facts of that case would not apply. Bodcaw creek is a well-defined stream, and the owners of lands across which it runs are entitled to see it maintained in its natural state, and this right is a continuing one, and, by virtue of § 3663 of C. & M. Digest, such right may be exercised by the landowner in removing from the stream anything which tends to obstruct it in its natural flow and to have a cause of action against any one whose acts might have occasioned the injury. Having a continuing right, it follows that the appellees would not be barred by the statute of limitations. *Beck* v. *State,* 179 Ark. 102-110. We are of the opinion that the appellees, Shewmake and Brown, were not guilty of such laches as would prevent them from invoking the aid of a court of equity. "Laches signifies not only an undue lapse of time, but also negligence in failing to act more promptly. It is therefore of the essence of laches that the party whose delay is in question shall have been blamable therefor in the contemplation of equity, and accordingly it must appear that he had knowledge, actual or imputable, of the facts, which should have prompted a choice either diligently to seek equitable relief or thereafter to be content with such remedies as a court of law might afford; * * *" 10 R. C. L., § 153.

The knowledge necessary to be had before laches will be imputed is not only the knowledge of the commission of an act, but of the extent and effect of the consequences which would follow. In this case it could not reasonably be said that the riparian owners should have foreseen when the gravel plant of the appellant was erected in 1925 that the consequences of its operation would destroy the beauty and utility of the stream in question which watered their grounds and afforded recreation for them and their friends. It is shown that a considerable quantity of gravel—indeed, the greater part—was sold and carried away in its natural state, and washing operations did not begin until some time after the erection of the plant. Under the facts in this case and the peculiar nature of the appellant's operations it cannot be said that equity imposed upon the appellees, Shewmake and Brown, the duty to make complaint of anticipated evil, or that a court of conscience would bar them because of their silence. When the doctrine of laches is invoked, each case must be governed by its own peculiar facts. In this case the chancellor has found the facts against the contention of the appellant in this regard, and we cannot say that this finding is against the preponderance of the testimony.

It is next contended by the appellant that the State is not entitled to the relief sought because the injury to the stream in question and to the fish therein is slight, and the advantage to the public by the operation of its plant is great. It is also contended that great damage would be inflicted upon the appellant, and great inconvenience incurred by the public if the judgment of the lower court should be affirmed. We will consider these several contentions together.

As to what Bodcaw creek was before the appellant began its operations in 1925 or 1926 there can be little doubt; it took its rise some miles above the lands of Shewmake and Brown, and from the peculiar nature of the ground over which it flowed, the waters, from time to

time, would disappear in the body of the stream to arise again a little further on, making disconnected pools, but, as it continued on its way gathering volume from its affluents, and from the springs along its shore, when it reached the lands of the appellees, it had become an ever-running brook rippling across the shallows and deepening into the pools, which in places reached the proportions of small lakes. This stream was, beyond the memory of the oldest inhabitant, the home of numerous fish of various species natural to the waters of southern Arkansas—several varieties of perch, the famed rock bass known locally as the goggle-eyed perch, and indeed, all other varieties of fish common to our streams. The creek meandered through the lands of the appellees and on below for many miles, taking its winding course into the State of Louisiana, and in all its length it was the resort of the inhabitants either for fishing or for disporting themselves in its waters. In short, as stated by one of the witnesses, ''It was a very pleasant stream.''

The chancellor has found, and we think not against the preponderance of the evidence, that the operation of the appellant's gravel plant has caused a marked change in the character of the stream in question and rendered it unfit for the propagation or habitat of fish. The water is no longer limpid and pure, but muddy and turbid, to the extent that fish are unable to live there, and those that reach this stream from below must come to the surface to obtain necessary oxygen, and after a time sink into the water only to die and be cast upon the shore. The pools and lakes in which the urchins and grown folks were wont to bathe are now so discolored and befouled by the foreign matter brought from the gravel plant above and held in suspension in the water, that they are no longer clean and clear, but discolor and coat the bodies of bathers with an unpleasant slime. Consequently, bathing is no longer indulged in. The fish have abandoned the waters and the fishermen can only make an occasional catch, where once fish abounded in plenty.

These facts, we think, call for the exercise of the regulatory power of the State so as to protect and restore this stream to its original state. Such power has been recognized from earliest times to inhere in the State. As has been stated in 11 R. C. L. 1047, cited in brief of appellee, "The regulatory power of a State extends not only to the taking of its fish, but also over the waters inhabited by the fish; its care of the fish would be of no avail if it had no power to protect the waters from pollution; it is immaterial whether the water is navigable or not; to the extent that streams are common passageways for fish to and from their breeding and feeding grounds, they are public waters and subject to governmental regulations. Thus, for the preservation of fish, the casting of sawdust or other mill refuse into streams may be forbidden. Moreover, the placing of mill refuse in a stream inhabited by fish may be considered a nuisance, and the Attorney General of a State, without the information of a private relator, may procure an injunction against the continuance of such a pollution of the stream. When the unrestrained right to run a sawmill on the bank of a stream conflicts with the right of the public to have fish live and increase in the water, the right of the mill proprietor must give way to the right of the public; nor can the owner of such a mill, by lapse of time, acquire a prescriptive right to discharge sawdust in the stream, so as to preclude the State from forbidding the practice. So the operator of a coal mine may be forbidden to drain sulphur or mine water into a stream though the stream be the natural receptacle of such drainage, and it is not practicable to drain the mine otherwise."

Counsel for the appellant, in their very able brief, insist that this rule would not apply to the operations of the establishment for the recovery of natural resources at the place where they are found, because the locality where such resource exists determines the place of the operation, and that where a lawful business is properly operated, and is engaged in the recovery of natural re-

sources, the courts will not enjoin the conduct of that business. In support of this contention, the appellant cites the case of *Pa. Coal Co.* v. *Sanderson,* 133 Pa. St. 126, 6 Atl. 453, 57 Am. Rep. 445, and the case of *Barnard* v. *Shirley,* 135 Ind. 547, 34 N. E. 600, 35 N. E. 117, 24 L. R. A. 568. These two cases may be distinguished from the case at bar in this particular; in *Pennsylvania Coal Co.* v. *Sanderson, supra,* the rights of the lower riparian owners to the use of the waters of a stream for domestic purposes was held to be inferior to the transaction of the business of mining coal where the operation of a mine in the ordinary and usual way polluted the stream by reason of drainage along its natural courses from the lands on which the mine was situate to the stream, on the theory that the rights of a private individual must give way to the interests of the community. In *Barnard* v. *Shirley, supra,* an owner of an artesian well upon his own land, who used the water for his patients in a sanitarium upon his own premises was not liable to injunction on the part of his neighbors for allowing the water to flow in its natural course upon their lands. In both of these cases it was the right of the individual that was denied, while in the instant case it is the right of the State which is being asserted—it is the community that is seeking relief against the operations of an individual injurious to such community.

As to the appellees, Shewmake and Brown, these cases are in conflict with the general rule and the decided weight of authority. See case note, 27 R. C. L. 1214. The general rule as to the rights of riparian owners may be thus stated: Every such proprietor is entitled to the usual flow of a stream in its natural channel over his land, undiminished in quantity and unimpaired in quality, subject to the reasonable use by upper proprietors, and with the right to make any reasonable use of the water necessary for his convenience or pleasure, including in non-navigable waters, the exclusive privilege of taking fish from the stream. Riparian rights inhere in

the owner of the soil and are part and parcel of the land itself, and are vested and valuable rights which no more may be destroyed or impaired than any other part of a freehold. 40 Cyc., p. 593 *et seq.; Miss. Mills Co.* v. *Smith,* 69 Miss. 299, 11 So. 26, 30 Am. St. Rep. 546; *McLaughlin* v. *Hope,* 107 Ark. 442, 155 S. W. 510, 47 L. R. A. (N. S.) 137; *El Dorado* v. *Scruggs,* 113 Ark. 239, 168 S. W. 846; *Taylor* v. *Steadman,* 143 Ark. 486, 220 S. W. 821, and cases cited in last case.

It is insisted, however, that the appellees have an adequate remedy at law by an action for damages. In this contention, the appellant errs for the reason that the injury, as shown by the testimony which was accepted by the chancellor, is a continuing and progressive one, and to remit them to their remedy at law would result in unnecessary expense and inconvenience to the litigants and lead to a multiplicity of suits. "The remedy at law, to be adequate and complete, and attain the full end and justice of the case, must reach the whole mischief, and secure the whole right of the party in a perfect manner, *in praesenti* and *in futuro." Ex parte* Conway, 4 Ark. 338. See also *Lawton* v. *Herrick,* 83 Conn. 417, 76 Atl. 986; *Peterson* v. *Santa Rosa,* 119 Cal. 387, 51 Pac. 557. But the appellant says the injury shown is slight and the resulting damage to it, by reason of the injunction, would be great. In this contention, appellant is concluded by the finding of the court below that the waters of Bodcaw creek have been so polluted as to destroy the fish therein and to render it unfit for the use or pleasure of the riparian proprietors. It would serve no useful purpose to detail the testimony of the several witnesses relative to this question. As before stated, it was conflicting, and we cannot say the chancellor's finding was against its preponderance. Whether the damage to the appellees was great or slight depends largely upon the point of view. In the eyes of those who burrow into the earth for inert and dull ores, whose value lies only in use, it may so appear; but value lies also in something more, and that is

valuable, whatever it may be, in proportion as it tends to promote not only a utilitarian purpose, but also contentment and rational pleasure. Certainly, a trout stream would add considerable value to a farm—the brook alone with its shining shallows and its deep quiet pools would necessarily add much to the charm of any farmstead, and considerably enhance its market value. Living water has always been deemed a valuable and desirable thing, and when that is sullied, as in this case, the injury is not slight, but substantial, and of which a court of equity will take cognizance and remedy by its injunctive power. Where the injury is a recurring one, and the damages sustained are of a substantial nature, equity will restrain its continuance by injunction. *Gus Blass Co.* v. *Reinman,* 102 Ark. 287, 143 S. W. 1087; *Lawton* v. *Herrick, supra; Peterson* v. *Santa Rosa, supra.* Neither is it an answer to the contention of the appellees that the business engaged in by the appellant is a lawful and useful one which is being conducted in a proper and customary manner, for the maxim, "So use that which is thine own as not to injure the rights of another," applies regardless of the character of a business. This rule is founded on good morals and natural justice, and applies to conflicting rights of every description (*Hitchman Coal Co.* v. *Mitchell,* 245 U. S. 229, 38 S. Ct. 65, referred to with approval in *Local Union, etc.,* v. *Stathakis,* 135 Ark. 86-93, 205 S. W. 450, 6 A. L. R. 894), among which are the rights of the State and riparian proprietors to have the waters of streams maintained free from pollution. 11 R. C. L. 1047, *ante,* and *Drake* v. *Lady Ensley Coal Co.,* 102 Ala. 501, 14 So. 749, 24 L. R. A. 64, 48 Am. St. Rep. 77, 24 L. R. A. 64.

The contention of the appellant that the decision of the lower court would result in destroying its business to its very great damage is not justified. It is true that some additional expense must be incurred by which the water flowing from appellant's plant must be freed from its impurities so that it might reach Bodcaw creek clear and pure. While the appellant's manager stated, if the

prayer of appellees' bill was granted his company would be forced to abandon its works and move away, in view of the magnitude of the plant and its remunerative character and the relatively small cost of the installation of settling basins, taking into consideration the amount already invested, we think the conclusion hardly justified. If the appellant should cease the operation of its plant, it would perhaps be caused more on account of the exhaustion of the gravel beds or the lack of purchasers for its output than on account of the additional investment of $10,500, which is shown to be about the amount required to install the settling basins in which the sediment from the operation of appellant's plant might be deposited. We recognize the importance of business enterprises, and where such are established at the only place where it is practical to operate such businesses, and they are conducted in the only practical manner, their right to operate will not be destroyed for trivial causes or for slight damage resulting to others. Where such interference would cause serious injury to them or loss to the community, a lawful business ought not to be destroyed or seriously inconvenienced except for the most serious cause. *Durfee* v. *Thalheimer,* 85 Ark. 544, 109 S. W. 519. But, as is said in the case of *Strobel* v. *Kerr Salt Co.,* 164 N. Y. 303, 58 N. E. 142, 51 L. R. A. 687, 79 Am. St. Rep. 643, "While the courts will not overlook the needs of important manufacturing interests, nor hamper them for trivial causes, they will not permit substantial injury to neighboring property with a small but long established business for the purpose of making a new and great industry flourish. They will not change the law relating to the ownership and use of property in order to accommodate a great business enterprise. According to the old and familiar rule, every man must so use his own property as not to injure that of his neighbor; and the fact that he has invested much money and employs many men in carrying on a lawful and useful business upon his own land does not change the rule."

We cannot say that the facts developed in this case would lead to the conclusion that any great injury would result to the appellant, or any loss to the State, by reason of the requirement of the court that the appellant cease to operate its business to the injury of others. The appellant complains that "the affirmance of this case would say, not only to the appellant, but to the entire world, that, notwithstanding Arkansas has wonderful natural resources, when you come into Arkansas and invest large sums of money for the purpose of developing these resources, you can be enjoined if in the course of your operations you damage any landowner, however slight, or if because of the natural drainage you necessarily permit water to flow into any branch or any creek, however small, or unimportant. The world will be told that any landowner so damaged will not be required to seek redress at law, but that he may go into a court of equity and restrain the operations entirely. Such a policy, if adopted in this State, would be ruinous, and would retard the very progress of the age." This conclusion by no means follows, nor is it the effect of the principles herein announced as applied to the testimony before the chancellor. Neither are the authorities cited by the appellant (except perhaps the cases of *Barnard* v. *Shirley,* 135 Ind. 547, 34 N. E. 600, 35 N. E. 117, 24 L. R. A. 568, and *Robb* v. *Carnagie Bros. & Co.,* 145 Pa. St. 324, 22 Atl. 649, 14 L. R. A. 329, 27 Am. St. Rep. 694) in conflict with the principles announced. The rules herein stated are neither novel nor dangerous; they recognize the rights of private or corporate enterprise, but do not overlook the rights of the humble and less important citizens. The maxim, "*Sic tuo utere,*" etc., must still be the rule of conduct. In a case where the facts were similar in their more important particulars to those of the instant case, a farm was injured from sediment cast upon it, and the waters of the stream flowing through it were polluted from the washing of iron ore, the court, in granting relief, said: "Under the provisions of the Constitution private property can-

not be taken for public use or by corporations without just compensation being first made to the owner, except by his consent. The courts—and it was never intended to be otherwise understood—are not the 'masons' to chisel away vested rights of property of private individuals, however humble and obscure the owner, for the benefit of the public or great corporations. It is the pride of this Republic that no man can be deprived of his property without due process of law, and the poorest citizen can find redress for an unlawful injury caused by his wealthy neighbor by appealing to the courts of this country." *Drake* v. *Lady Ensley Coal Co.,* 102 Ala. 501, 14 So. 749, 751, 24 L. R. A. 64, 48 Am. St. Rep. 77.

We are of the opinion that the finding of the court below was not against the preponderance of the testimony, and, applying the principles of law hereinbefore stated to the facts as found by the chancellor, we concur in the judgment rendered, and it will be affirmed.