HARRIS v. BROOKS.

5-711                                                283 S. W. 2d 129

Opinion delivered October 24, 1955.

*William H. Donham,* for appellant.

*John D. Eldridge, Jr.,* for appellee.

PAUL WARD, Associate Justice. The issues presented by this appeal relate to the relative rights of riparian landowners to the use of a privately owned non-navigable lake and the water therein.

Appellant, Theo Mashburn, lessee of riparian landowners conducts a commercial boating and fishing enterprise. In this business he rents cabins, sells fishing bait and equipment, and rents boats to members of the general public who desire to use the lake for fishing and other recreational purposes. He and his lessors filed a complaint in chancery court on July 10, 1954, to enjoin appellees from pumping water from the lake to irrigate a rice crop, alleging that, as of that date, appellees had reduced the water level of the lake to such an extent as to make the lake unsuitable "for fishing, recreation, or

other lawful purposes.'' After a lengthy hearing, the Chancellor denied injunctive relief, and this appeal is prosecuted to reverse the Chancellor's decision.

*FACTUAL BACKGROUND.* Horseshoe Lake, located about 3 miles south of Augusta, is approximately 3 miles long and 300 feet wide, and, as the name implies, resembles a horseshoe in shape. Appellees, John Brooks and John Brooks, Jr., are lessees of Ector Johnson who owns a large tract of land adjacent to the lake, including three-fourths of the lake bed.

For a number of years appellees have intermittently raised rice on Johnson's land and have each year, including 1954, irrigated the rice with water pumped from the lake. They pumped no more water in 1954 than they did in 1951 and 1952, no rice being raised in 1953. Approximately 190 acres were cultivated in rice in 1954.

The rest of the lake bed and the adjoining land is divided into four parts, each part owned by a different person or group of persons. One such part is owned by Ed Harris, Jesse Harris, Alice Lynch and Dora Balkin who are also appellants. In March, 1954, Mashburn leased from the above named appellants a relatively small camp site on the bank of the lake and installed the business above mentioned at a cost of approximately $8,000, including boats, cabins, and fishing equipment. Mashburn began operating his business about the first of April, 1954, and fishing and boat rentals were satisfactory from that time until about July 1st or 4th when, he says, the fish quit biting and his income from that source and boat rentals was reduced to practically nothing.

Appellees began pumping water with an 8-inch intake on May 25, 1954, and continued pumping until this suit was filed on July 10, and then until about August 20th. They quit pumping at this time because it was discovered fish life was being endangered. The trial was had September 28, 1954, and the decree was rendered December 29, 1954.

*THE TESTIMONY.* Because of the disposition we hereafter make of this case, it would serve no useful purpose to set out the voluminous testimony in detail or attempt to evaluate all the conflicting portions thereof. The burden of appellants' testimony, given by residents who had observed the lake over a period of years and by those familiar with fish life and sea level calculations, was directed at establishing the *normal* or *medium* water level of the lake. The years 1952, 1953 and 1954 were unusually dry and the water levels in similar lakes in the same general area were unusually low in August and September of 1954. During August 1954 Horseshoe Lake was below "normal," but it is not entirely clear from the testimony that this was true on July 10 when the suit was filed. It also appears that during the stated period the water had receded from the bank where Mashburn's boats were usually docked, making it impossible for him to rent them to the public. There is strong testimony, disputed by appellees, that the *normal* level of the lake is 189.67 feet above sea level and that the water was below this level on July 10. Unquestionably the water was below normal when this suit was tried the latter part of September, 1954.

On the part of appellees it was attempted to show that; they had used the water for irrigation several years dating back to 1931 and Mashburn knew this when he rented the camp site; although they had been pumping regularly since May 25, 1954, the water did not begin to fall in the lake until July 1st or 4th; an agent of the Arkansas Game and Fish Commission examined the lake and the water about July 2nd and found no condition endangering fish life, and similar examinations after suit was filed showed the same condition, and; they stopped pumping about August 20th when they first learned that fish life was being endangered.

*ISSUES CLARIFIED.* In refusing to issue the injunction the Chancellor made no finding of facts, and did not state the ground upon which his decision rested. Appellants strongly insist that the Chancellor was forced by the testimony to conclude first that the normal level

of the lake was 189.67 feet above sea level and second that the water in the lake was at or below this level when the suit was filed on July 10th. This being true, appellants say, it was error for the Chancellor to refuse to enjoin appellees from pumping water out of the lake. If it be conceded that the testimony does show and the Chancellor should have found that the water in Horseshoe Lake was at or below the normal level when this suit was filed on July 10th, then appellants would have been entitled to an injunction provided this case was decided strictly under the uniform flow theory mentioned hereafter. However as explained later we are not bound by this theory in this state. It appears to us there might have been some confusion as to the ground upon which appellants based their contention for relief. Under the pleadings it appears that they may be asking for relief on two separate grounds: (a) The right to fish and (b) The right to conduct a commercial boating enterprise. It was incumbent upon appellants to show that one or both rights were unreasonably interfered with when the water level sank below "normal." It is difficult to tell whether the testimony establishes this fact in either instance. (a) The only testimony in the first instance is that fish quit biting somewhere about the 4th of July but there was no conclusive evidence that this was caused by the lake being below "normal" level. It is common knowledge that fish quit biting sometime for no apparent good reason. There was no testimony that fish life was endangered before July 10th but on the other hand there was positive testimony to the contrary. (b) Likewise there was no conclusive testimony showing that it was impractical to dock or run boats on the lake prior to July 10th. Moreover it would be pure conjecture to say that the same water level, whether normal or otherwise, controlled both fishing and boating. Certainly appellants made no attempt to make any distinction either in the pleadings or by the testimony between the two causes of action.

In view of the above situation it is urged by appellees that the case should therefore be affirmed, but we have concluded that the best interest of the parties hereto

and the public in general will be served by concluding this case in the light of the announcements hereafter made and the conclusions hereafter reached. Before attempting such conclusion it appears proper to make some general observations relative to the law regulating the use of water in lakes and streams.

*TWO BASIC THEORIES.* Generally speaking two separate and distinct theories or doctrines regarding the right to use water are recognized. One is commonly called the "Appropriation Doctrine" and the other is the "Riparian Doctrine."

*Appropriation Doctrine.* Since it is unnecessary to do so we make no attempt to discuss the varied implications of this doctrine. Generally speaking, under this doctrine, some governmental agency, acting under constitutional or legislative authority, apportions water to contesting claimants. It has never been adopted in this state, but has been in about 17 western states. This doctrine is inconsistent with the common law relative to water rights in force in this and many other states. One principal distinction between this doctrine and the riparian doctrine is that under the former the use is not limited to riparian landowners.[1]

*Riparian Doctrine.* This doctrine, long in force in this and many other states, is based on the old common law which gave to the owners of land bordering on streams the right to use the water therefrom for certain purposes, and this right was considered an incident to the ownership of land. Originally it apparently accorded the landowners the right to have the water maintained at its normal level, subject to use for strictly domestic purposes. Later it became evident that this strict limitation placed on the use of water was unreasonable and

[1] Wells A. Hutchins, U. S. Department of Agriculture in a paper presented before the Midwestern States Flood Control Conference, East Lansing, Michigan, on June 15, 1954, among other things, said: "The effect of the repudiation of a common law system and its complete replacement by an appropriative system is to deny the right of an owner of land bordering a stream . . . to divert and make use of the water solely by reason of his ownership of the land; to declare all such waters to be the property of the state, and; to make all waters . . . open to appropriation for beneficial use. . . ."

unutilitarian. Consequently it was not long before the demand for a greater use of water caused a relaxation of the strict limitations placed on its use and this doctrine came to be divided into (a) the natural flow theory and (b) the reasonable use theory.

(a) *Natural Flow Theory.* Generally speaking again, under the natural flow theory, a riparian owner can take water for domestic purposes only, such as water for the family, livestock, and gardening, and he is entitled to have the water in the stream or lake upon which he borders kept at the normal level. There are some expressions in the opinions of this court indicating that we have recognized this theory, at least to a certain extent.[2]

*Reasonable Use Theory.* This theory appears to be based on the necessity and desirability of deriving greater benefits from the use of our abundant supply of water. It recognizes that there is no sound reason for maintaining our lakes and streams at a normal level when the water can be beneficially used without causing unreasonable damage to other riparian owners. The progress of civilization, particularly in regard to manufacturing, irrigation, and recreation, has forced the realization that a strict adherence to the uninterrupted flow doctrine placed an unwarranted limitation on the use of water, and consequently the courts developed what we now call the reasonable use theory. This theory is of course subject to different interpretations and limita-

---

[2] In *St. Louis Southwestern Railway Company* v. *Mackey,* 95 Ark. 297, 129 S. W. 78, at page 299 of Ark. Reports, it was said: "It is the right of each proprietor along a natural drain or watercourse to insist that the water shall continue to flow as it has been used and accustomed to do so; . . . ."

In *Taylor* v. *Rudy,* 99 Ark. 128, 137 S. W. 574, this language was used at page 132 of the Ark. Reports: "Every owner of land through which a stream of water flows is entitled to the use and enjoyment of the water, and to have the same flow in its natural and accustomed course without obstruction, diversion or corruption."

In *Meriwether Sand & Gravel Company* v. *State Ex Rel. Attorney General,* 181 Ark. 216, 26 S. W. 2d 57, at page 226 of the Ark. Reports, it was said: "Every such proprietor is entitled to the usual flow of a stream in its natural channel over his land, undiminished in quantity and unimpaired in quality, subject to the reasonable use by upper proprietors, and with the right to make any reasonable use of the water necessary for his convenience or pleasure, including in non-navigable waters, the exclusive privilege of taking fish from the stream."

tions. In 56 Am. Jur., page 728, it is stated that "The rights of riparian proprietors on both navigable and unnavigable streams are to a great extent mutual, common, or correlative. The use of the stream or water by each proprietor is therefore limited to what is reasonable, having due regard for the rights of others above, below, or on the opposite shore. In general, the special rights of a riparian owner are such as are necessary for the use and enjoyment of his abutting property and the business lawfully conducted thereon, qualified only by the correlative rights of other riparian owners, and by certain rights of the public, and they are to be so exercised as not to injure others in the enjoyment of their rights." It has been stated that each riparian owner has an equal right to make a reasonable use of waters subject to the equal rights of other owners to make the reasonable use (*U. S.* v. *Willow River Power Co.,* 324 U. S. 499, 65 S. C. 761, 89 L. Ed. 1101). The purpose of the law is to secure to each riparian owner equality in the use of water as near as may be by requiring each to exercise his right reasonably and with due regard to the rights of others similarly situated. (*Meng.* v. *Coffey,* 67 Neb. 500, 93 N. W. 713, 108 Am. St. Rep. 697).

This court has to some extent recognized the reasonable use theory (*Thomas* v. *LaCotts,* 222 Ark. 171, 257 S. W. 2d 936; *Ralph R. Harrell, et al.,* v. *City of Conway, et al.,* 224 Ark. 100, 271 S. W. 2d 924; but we have also said (in the *City of Conway* case) that the uniform flow theory and the reasonable use theory are inconsistent and, further that we had not yet made a choice between them. It is not clear that we made a choice in that case. The nucleus of this opinion is, therefore, a definite acceptance of the reasonable use theory. We do not understand that the two theories will necessarily clash in every case, but where there is an inconsistency, and where vested rights may not prevent, it is our conclusion that the reasonable use theory should control.

In embracing the reasonable use theory we caution, however, that we are not necessarily adopting all the interpretations given it by the decisions of other states,

and that our own interpretation will be developed in the future as occasions arise. Nor is it intended hereby that we will not in the future, under certain circumstances, possibly adhere to some phases of the uniform flow system. It is recognized that in some instances vested rights may have accrued to riparian landowners and we could not, of course, constitutionally negate those rights.[3]

It should also be made clear that nothing in this opinion is intended to or can infringe upon the powers of the Arkansas State Game and Fish Commission as invested by Amendment No. 35 to the Constitution of this State. It is recognized that said Commission has the power to propagate, preserve, and protect fish in streams and lakes. In exercising this power the Commission will undoubtedly be interested in some instances in the amount of water that may be removed from lakes or streams where injury to fish life is involved.

The result of our examination of the decisions of this court and other authorities relative to the use by riparian proprietors of water in non-navigable lakes and streams justifies the enunciation of the following general rules and principles:

(a) The right to use water for strictly domestic purposes—such as for household use—is superior to many other uses of water—such as for fishing, recreation and irrigation.[4]

(b) Other than the use mentioned above, all other lawful uses of water are equal.[5]

---

[3] In the case of *Meriwether Sand & Gravel Company* v. *State Ex Rel. Attorney General, supra,* at page 226, Ark. Reports, this court said: "Riparian rights inhere in the owner of the soil and are part and parcel of the land itself, and are vested and valuable rights which no more may be destroyed or impaired than any other part of a freehold." This right was also recognized in the *LaCotts* case, *supra.*

[4] The use of water for domestic purposes is usually accorded a preference over the demands of irrigation and manufacturing. 56 Am. Jur. 784, § 343. *Humphreys-Mexia Co.* v. *Arseneaux,* 116 Tex. 603, 297 S. W. 225, 53 A. L. R. 1147.

[5] In the case of *Taylor* v. *Tampa Coal Co.* (Fla.), 46 So. 2d 392, at page 394, it is stated: "It is the rule that the rights of riparian proprietors to the use of waters in a non-navigable lake such as the one here involved are equal."

Some of the lawful uses of water recognized by this state are: fishing, swimming, recreation, and irrigation.[6]

(c) When one lawful use of water is destroyed by another lawful use the latter must yield, or it may be enjoined.

(d) When one lawful use of water interferes with or detracts from another lawful use, then a question arises as to whether, under all the facts and circumstances of that particular case, the interfering use shall be declared unreasonable and as such enjoined, or whether a reasonable and equitable adjustment should be made, having due regard to the reasonable rights of each.[7]

*Application to This Case.* Some of the questions, therefore, which must be considered are these:

(a) Had appellees on July 10, 1954, by the continued use of water from Horseshoe Lake, destroyed appellants' right to fish and conduct the boating enterprise? If so, the injunction should be granted.

(b) If it is found, however, that appellants' rights had only been impaired at the stated time, then it must be judged, under all the facts and circumstances as before mentioned, whether such impairment is unreasonable. If it is so found then the injunction should issue. If it is found that appellants' rights have not been unreasonably impaired, having due regard to all the facts and circumstances and the injury which may be caused appellees as weighed against the benefits accruing to appellants, then the injunction should be denied.

We do not minimize the difficulties attendant upon an application of the reasonable use rule to any given set of facts and circumstances and particularly those

---

[6] See *Meriwether Sand & Gravel Co.* v. *State Ex Rel. Attorney General, supra,* and *Barboro* v. *Boyle,* 119 Ark. 377, 178 S. W. 378, at pages 382, 383 of the Ark. Reports.

[7] In 56 Am. Jur., page 783, it is stated: "In determining whether an artificial use of the water of a stream is reasonable or not, it is necessary to consider what the use is for, its extent, duration, necessity, and application, the nature and size of the stream, and the several uses to which it is put, the extent of the injury to one proprietor and the benefit to the other, and all other facts which may bear upon the reasonableness of the use."

present in this instance. It is obvious that there are no definite guide posts provided and that necessarily much must be left to judgment and discretion. The breadth and boundaries of this area of discretion are well stated in Restatement of the Law, Torts, § 852c in these words: "The determination in a particular case of the unreasonableness of a particular use is not and should not be an unreasoned, intuitive conclusion on the part of the court or jury. It is rather an evaluating of the conflicting interests of each of the contestants before the court in accordance with the standards of society, and a weighing of those, one against the other. The law accords equal protection to the interests of all the riparian proprietors in the use of water, and seeks to promote the greatest beneficial use of the water, and seeks to promote the greatest beneficial use by each with a minimum of harm to others. But when one riparian proprietor's use of the water harmfully invades another's interest in its use there is an incompatibility of interest between the two parties to a greater or lesser extent depending on the extent of the invasion, and there is immediately a question whether such a use is legally permissible. It is axiomatic in the law that individuals in society must put up with a reasonable amount of annoyance and inconvenience resulting from the otherwise lawful activities of their neighbors in the use of their land. Hence it is only when one riparian proprietor's use of the water is unreasonable that another who is harmed by it can complain, even though the harm is intentional. Substantial intentional harm to another cannot be justified as reasonable unless the legal merit or utility of the activity which produces it outweighs the legal seriousness or gravity of the harm."

In all our consideration of the reasonable use theory as we have attempted to explain it we have accepted the view that the benefits accruing to society in general from a maximum utilization of our water resources should not be denied merely because of the difficulties that may arise in its application. In the absence of legislative directives, it appears that this rule or theory is the best that the courts can devise.

*OUR CONCLUSION.* After careful consideration, an application of the rules above announced to the complicated fact situation set forth in this record leads us to conclude that the Chancellor should have issued an order enjoining appellees from pumping water out of Horseshoe Lake when the water level reaches 189.67 feet above sea level for as long as the material facts and circumstances are substantially the same as they appear in this record. We make it clear that this conclusion is not based on the fact that 189.67 is the normal level and that appellees would have no right to reduce such level. Our conclusion is based on the fact that we think the evidence shows this level happens to be the level below which appellants would be unreasonably interfered with. This holding is, we think, in harmony with the holding in the *Tampa Coal Company* case, *supra.* That case involved a shallow privately owned lake similar to the one under consideration. Taylor was enjoined from pumping the water from the lake to irrigate his citrus grove on the ground that to do so destroyed the use of the lake by the employees of the Coal Company for recreational purposes. The court held that Taylor could not pump water from the lake after it reached the normal level. A careful reading of the case, however, shows that the decision was not based on the normal level or natural flow theory but rather on the fact that that level happened to be the one below which it would be unreasonable to reduce the water. In reaching its conclusion the court, among other things, said: ". . . each riparian owner has the right to use the water in the lake for all lawful purposes, so long as his use of the water is not detrimental to the rights of other riparian owners. From the evidence in the record it is plain that when the water of the lake here involved is at a normal level the lake is too small in area and content to allow water to be pumped therefrom for irrigation purposes without consequent damage to other riparian owners." The court then justified its conclusion "when conditions are such that the lake is either at or below normal water level and the use thereof for irrigation purposes will operate to the injury of other riparian owners. . . ."

We think the conclusion we have reached is not only logical but practical. Although appellees had quit using water from the lake when this case was tried yet they testified that they intended to use water therefrom in 1955. We might assume that they would want to also use water in subsequent years, so it would seem to be to the best interest of all parties concerned to have a definite level fixed at which pumping for irrigation must cease in order to avoid useless litigation.

Appellees make the point that the Chancellor should be sustained because they have acquired a prescriptive right to the unlimited use of the water in Horseshoe Lake, and, to the same effect, that appellants are estopped from asserting any rights to the contrary. We cannot sustain this contention. Although appellees, according to the record, have used this water for irrigation purposes on several occasions in previous years, dating back for more than seven years, yet it appears that appellants had not been disturbed in the exercise of their riparian rights previous to 1954. Prior to that year appellees had merely been exercising their lawful rights as riparian owners and their exercise of those rights was in no way adverse to the rights of any one. (56 Am. Jur., p. 730, § 343) in the *City of Conway* case, *supra*, where the same contention was made that appellees here make the contention was denied, the court saying: "We are unable to find any act or acts on the part of Conway of an adverse claim or nature, or such as would put appellants on notice of any adverse claim." The court then followed with citations which are applicable here.

Reversed with direction to the trial court to enter a decree in conformity with this opinion.

Justice McFADDIN concurs.