JONES *v.* OZ-ARK-VAL POULTRY CO.

5-1295                                    306 S. W. 2d 111

Opinion delivered October 14, 1957.

[Rehearing denied November 18, 1957.]

*Hardin, Barton, Hardin & Garner,* for appellant.

*Shaw, Jones & Shaw* and *Richard Mobley,* for appellee.

SAM ROBINSON, Associate Justice. This case involves the right to the use of subterranean waters by adjoining landowners. Appellant, Paul Jones, and his wife, Elwanda Jones, own a small parcel of land on which they live, near Bloomer, Arkansas, and the appellant, Mrs. Laura Ward, owns and lives on an adjoining small acreage. The appellee, A. T. Crouch Creamery Company, owns land adjacent to the Jones and Ward lands. In the years 1954 and 1955 the appellees drilled water wells on the Crouch property, and the water from these wells was conveyed by a pipe line to chicken processing plants operated by appellee, Oz-Ark-Val Poultry Company, under a lease agreement with the Crouch Creamery Company.

Appellants filed this suit, alleging appellees were using subterranean waters from seven wells they had drilled on the Crouch property, to such an extent that wells used for domestic purposes, located on the adjacent Jones and Ward lands, had been caused to go dry. Appellants asked that appellees be enjoined from using the wells on the Crouch property for processing chickens, and also prayed for damages alleged to have been sustained. The chancellor was of the opinion that the use of water from the wells on the Crouch property for the purpose of processing chickens was not the cause of the failure of the Jones and Ward wells, and, therefore, rendered a decree in favor of the defendants, the appellees here. The Joneses and Mrs. Ward have appealed.

In our opinion, a preponderance of the evidence proves that the use of water on the Crouch property for the purpose of processing chickens caused the Jones and Ward wells to go dry. To sustain the decree, appellees rely largely on the testimony of Mr. James M. Rutledge,

a registered engineer, to the effect that there was a severe drouth during the years 1952 to 1955, inclusive, which caused a lowering of the underground water level; that the amount of water taken by appellee was inconsequential; and, furthermore, that the water in the wells on the Crouch property came from a different source of supply than the water going into the Jones and Ward wells. But this opinion evidence of an expert, regardless of how well qualified he may be, does not carry much weight in the face of positive testimony of existing facts leading to a different conclusion.

Mrs. Ward has lived on her place for more than a quarter of a century; she had an extraordinarily good artesian well; it was sufficient to supply all domestic needs, including the watering of twenty head of cattle, and a surplus ran over the top of the well into a stream. The Joneses bought their property in 1951, and the well thereon furnished an ample supply of water until July, 1954, when the appellees put down two wells on the adjoining Crouch property. After the two wells were completed, appellees proceeded to test them by determining the amount of water the wells would supply within a given time. When water was pumped from the Crouch wells, in making the test, the Jones and Ward wells went dry within two hours from the time the test was started. After the test was completed on the Crouch wells, the well pipes were capped, and no water was used from the Crouch property at that time. Almost immediately, water again returned to the Jones and Ward wells, and they furnished water the same as they had done before the tests were made on the Crouch wells.

In July, 1955, the Crouch wells were put in use in processing chickens and the Jones and Ward wells again went dry. This condition continued until September, 1955, when Jones, whose well was forty-eight feet deep, extended it to a depth of one hundred and fifty feet. He obtained water at that depth until January, 1956. In the meantime, appellee put down five additional wells on the adjoining Crouch property, and the Joneses' one hundred and fifty-foot well went dry. At the time of the

trial, the wells on the Crouch property were not in use, and water had returned to the Jones and Ward wells.

The fact that every time the chicken processing plant put the wells on the Crouch property in use the Jones and Ward wells went dry, and every time the Crouch wells were shut down the Jones and Ward wells again produced water, shows just about as conclusively as it is possible to prove anything by circumstantial evidence that the large amount of water taken from the Crouch wells to process the chickens caused the Jones and Ward wells to go dry. Oz-Ark-Val was processing up to twelve thousand chickens per day; it required two to three gallons of water for each fowl. A well located at the plant in the town of Bloomer was capable of supplying about two-thirds of the water required; but this left a deficiency of several thousand gallons of water per day, to be provided from the Crouch property adjoining the appellants' land. The underground water was simply not there in sufficient quantity to supply the poultry plant and leave enough for the dometic needs of the Joneses and Mrs. Ward.

As to water rights of riparian owners, this State has adopted the reasonable use rule. *Harris* v. *Brooks,* 225 Ark. 436, 283 S. W. 2d 129; *Harrell* v. *City of Conway,* 224 Ark. 100, 271 S. W. 2d 924. We see no good reason why the same rule should not apply to a true subterranean stream or to subterranean percolating waters. Text writers have divided subterranean waters into two classifications, namely, percolating waters and underground streams. In 93 C. J. S. 761, it is said:

"In legal consideration, subterranean waters are divided into two classes, namely, percolating waters and underground streams. Flowing subterranean waters consist of waters whose courses are well-defined and reasonably ascertainable and whose existence is not of a temporary or ephemeral character. 'Percolate,' in this connection, is a term which may designate any flowage or subsurface water, other than that of a running stream open, visible, and clearly to be traced. The term 'percolating waters' includes all waters which pass through

the ground beneath the surface of the earth without a definite channel and not shown to be supplied by a definite flowing stream; percolating waters are those which seep, ooze, filter, and otherwise circulate through the subsurface strata without definite, or defined, channels, or in a course that is unknown and not discoverable from surface indications without excavation for that purpose. Percolating waters may be either rain waters which are slowly infiltrating through the soil or they may be waters seeping through the banks or bed of a stream which have so far left the bed and other waters as to have lost their character as part of its flow.

"The general rule, which has been said to be well stated in corpus juris, is that all underground waters are presumed to be percolating, and, to take them out of the rule with respect to such waters, the existence and course of a permanent channel must be clearly shown. A well will be presumed to be from percolating water, in the absence of proof to the contrary."

The English rule has been that the landowner is entitled to extract from the ground all of the water he could obtain from under his own land. This rule has been adopted by several of the states. See 55 A. L. R. 1390 for list of cases following English rule. On the other hand, about an equal number of states have adopted the rule of reasonable use, known as the American rule, as applied to underground water. Cases so holding are cited in 55 A. L. R. 1398. Several of the states which first adopted the English rule later changed to the American rule.

"At an early day the courts expressed dissatisfaction with the common-law or English rule as to rights in percolating water. In *Bassett* v. *Salisbury Mfg. Co.* (1862) 43 N. H. 569, 82 Am. Dec. 179, where the question before the court was in regard to drainage of surface water, the court, in discussing the theory of rights in waters, both surface and subterranean, suggests that the right of a landowner to appropriate percolating water in his own land is limited by the corresponding right of his neighbor, and extends only to a reasonable exercise of

such right; or, as said by the court, the rights are correlative. This dictum was approved in *Swett* v. *Cutts* (1870) 50 N. H. 439, 9 Am. Rep. 276. The Bassett case appears to be the first case in which the doctrine of correlative rights in percolating waters is mentioned, and it is cited with approval and its doctrine adopted in full in *Katz* v. *Walkinshaw* (1902) 141 Cal. 116, 64 L. R. A. 236, 99 Am. St. Rep. 35, 74 Pac. 766, 70 Pac. 663, the first case in which the rule of reasonable use of correlative rights is applied. But even before this, COLERIDGE, J., dissenting in the case of *Chasemore* v. *Richards* (1857) 2 Hurlst. & N. 186, 157 Eng. Reprint, 71, the leading case in England upon the question of rights in percolating waters, expressed the opinion that the rights of adjoining landowners in regard to percolating water in their lands should be governed by the maxim, *'sic utere tuo ut alienum non laedas,'* and not by the rule of absolute ownership applied; and Lord Wensleydale, in the same case before the House of Lords in (1859) 7 H. L. Cas. 349, 11 Eng. Reprint, 140, 1 Eng. Rul. Cas. 729, expressed dissatisfaction with the working of the common-law rule.

"Beginning with *Katz* v. *Walkinshaw* (Cal.) *supra,* the courts began to limit or break away from the common-law rule in regard to percolating waters, and apply what they called, variously, the rule of 'reasonable use,' the rule of correlative rights, or the American rule." 55 A. L. R. 1398.

The American rule is well stated in *Hudson* v. *Dailey,* 156 Cal. 617, 105 Pac. 748:

"Where two or more persons own different tracts of land, underlaid by porous material extending to and communicating with them all, which is saturated with water moving with more or less freedom therein, each has a common and correlative right to the use of this water upon his land, to the full extent of his needs, if the supply is sufficient, and to the extent of a reasonable share thereof, if the supply is so scant that the use by one will affect the supply of the others."

In *Restatement of the Law of Torts,* Sec. 858, it is said:

"Therefore, each possessor's rights and privileges with respect to the use of subterranean waters are qualified rather than absolute for the same reasons that each riparian proprietor's rights and privileges with respect to the use of water in the watercourse or lake are qualified and not absolute. . . ."

Without a supply of water for domestic needs, appellants' property becomes wholly unsuitable as a place to live, and it does not appear to have much value for any other purpose. It is unreasonable to permit appellees to use thousands of gallons of water per day for the purpose of processing chickens, not leaving enough water for the domestic needs of the Joneses and Mrs. Ward. In addition to asking that appellees be restrained from taking an unreasonable amount of water from the ground, appellants prayed for damages alleged to have been sustained. As above stated, the Chancellor did not reach the question of damages. On appeal we allow no damages because, in our opinion, the evidence is not sufficient in that regard.

Reversed with directions to enter a decree not inconsistent herewith.

HARRIS, C. J., and McFADDIN, J., dissent.

CARLETON HARRIS, Chief Justice (dissenting). I dissent for the reason that I do not consider the Chancellor's findings to be against the preponderance of the evidence.

ED. F. McFADDIN, Associate Justice (dissenting). I respectfully dissent in this case; and there are three points to be covered in the dissent.

I. *The Majority Says That the Chancellor Decided Against the Preponderance of the Evidence.* I think the Chancellor decided according to the preponderance of the evidence; and I think the majority is using faulty logic in arriving at its conclusion. The majority says:

"The fact that every time the chicken processing plant put the wells on the Crouch property in use, the Jones and Ward wells went dry, and every time the Crouch wells were shut down the Jones and Ward wells

again produced water, shows just about as conclusively as it is possible to prove anything by circumstantial evidence that the large amount of water taken from the Crouch wells to process the chickens caused the Jones and Ward wells to go dry."

Now the quoted statement evidently presupposes that the only wells in the vicinity of Bloomer were the Ward well, the Jones well, and the Crouch wells. But the maps and plats introduced in evidence show over sixty wells within two thousand feet of the Ward and Jones wells. Approximately thirty of the sixty wells were "dry," and about thirty were "wet" or producing. There is no showing whatsoever as to how much water was being taken from each of the thirty wells at the time the Crouch wells were pumping. In other words, for all the evidence in this case shows, some other wells might have been pumping besides the Crouch wells and might have been causing the trouble to the Jones and Ward wells, and also to some of the Crouch wells that went dry.

The defendant's Exhibit No. 1, introduced by consent, shows the exact location of each well in the community of Bloomer, and which wells are dry and which wells are wet. The defendant's Exhibit No. 2 shows how near the water level came to the ground level in each well. It is interesting to note some of the other nearby wells not involved in this litigation but shown on the exhibit; the Mikel well 110 feet deep had thirty feet of water, and the Bowen well—immediately adjacent and 109 feet in depth—was dry. Another interesting thing is: that one of the Tuggle wells 90 feet deep was dry, and another one 85 feet deep and immediately adjacent contained 55 feet of water. In short, the underground formation and strata in and around Bloomer was shown to be terribly scrambled to produce such conditions in the water wells.

The foregoing could be developed at length; and a reproduction of the plats would clearly demonstrate the correctness of the testimony of the defendant's witnesses, Rutledge, Gibson and McConnell, to the effect that the water conditions in the vicinity of Bloomer for the past several years have been influenced by the drouth, rather

than by the pumping of the wells. The Chancellor found that the use of water by the Oz-Ark-Val Poultry Company from the wells on the Crouch property was not the cause of the failure of the Jones and Ward wells. I respectfully submit that the Chancellor was correct and that the majority is in error in holding that the Chancellor's finding was against the preponderance of the evidence.

II. *The Majority, By Judicial Fiat, Adopts the American Theory of "Reasonable Use" Rather Than the Common-law Rule of "Takers-keepers."* In 56 Am. Jur. 595, "Waters," § 113, the common-law rule is stated:

"According to the doctrine known as the 'common-law' or 'English' rule, percolating water, as herein defined, is regarded as being as much a part of the freehold through which it courses or percolates as the clays, sand, gravel, and rocks found therein, and the owner, at least in the absence of malice and of any contractual or statutory restriction, has the absolute right to intercept the water before it leaves his premises and makes whatever use of it he pleases, regardless of the effect that such use may have on an adjoining or a lower proprietor through whose land the water, in its natural course, would filtrate, percolate, or flow."

I think we should follow the common-law rule until the Legislature sees fit to change the common-law rule. It is well known in Arkansas that in the past two sessions of the Legislature, the question of legislation concerning water has been one of the most controversial issues. We have had a great deal of trouble trying to decide surface water cases; and subterranean water cases are far more difficult of decision. Act No. 81 of 1957 affects surface water; yet the majority, by this opinion, is adopting the "reasonable use" rule for percolating waters in advance of any action by the Legislature. I submit that we should follow the common-law until the Legislature prescribes otherwise, because Arkansas is a common-law State.

III. The third reason for my dissent is, that even if the majority adopts the "reasonable use" theory, still there is nothing in the record in this case to show that the

poultry company was making an unreasonable use of the water. In 56 Am. Jur. 600, "Waters," § 117, this is stated:

"As applied in most jurisdictions, however, the rule of reasonable use or correlative rights prevents the withdrawal of percolating waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, . . ."

It was shown in this case that the poultry company used about 23,000 gallons a day at its peak load in processing the poultry. Mr. McConnell testified that only 5,000 gallons per day of this water came from the Crouch 10-acre property. So the question is, whether 5,000 gallons of water per day from seven wells is an unreasonable amount of water to use. That is less than 1,000 gallons of water per day per well. Mr. Gibson, the man who drilled most of the wells that had been drilled in Bloomer, testified that a fair home well would make 350 gallons per hour, and that a good well would make 900 gallons per hour, or fifteen gallons a minute. The poultry company was using less than 1,000 gallons per well in 24 hours, which is about 40 gallons an hour per well. If a fair home well produces 350 gallons per hour, and the poultry company was only using 40 gallons per hour, then certainly the poultry company was not making an unreasonable use of water from the wells on the 10-acre tract here involved. Furthermore, the poultry company was taking this water from its wells to its plant, a distance of approximately 2,000 feet. The poultry company was not selling the water like a municipality or water company; it was using it for its own use. It bought the land; and I submit that there is nothing in this record to show an unreasonable use so as to justify the injunction that the majority is sanctioning.