107 So.2d 148 (1958)
Elizabeth J. DUVAL and Marian Hruby, Appellants,
v.
Vernon T. THOMAS and Ruby Lee Thomas, Appellees.
No. 442.
District Court of Appeal of Florida. Second District.
October 24, 1958.
Rehearings Denied December 11, 1958.
O.K. Reaves, of Mabry, Reaves, Carlton, Fields & Ward, Tampa, for appellant Duval.
*149 G. Richard Christ, Tampa, for appellant Hruby.
John S. Berry, Tampa, for appellees.
SHANNON, Judge.
Appellants were the two defendants in the court below and they are appealing from the final decree of the chancellor.
The final decree of the chancellor reads in part as follows:
"1. That this Court has jurisdiction of the parties and of the subject matter of this cause; that Plaintiffs, Vernon T. Thomas and wife, Ruby Lee Thomas, have the riparian right of ingress and egress in and to the main body of Lake Calm for reasonable use subject to the limitation that such reasonable use shall not invade the right of other riparian owners; that the erection of the fillbarrier by the Defendant, Elizabeth J. Duval, and the fence by the Defendant, Marian Hruby, to the southeastern corner of Plaintiffs' property serve no useful purpose and are an unreasonable use of that portion of Lake Calm by said Defendants; that the Defendant, Marian Hruby, shall immediately remove all of the fence posts which have been placed along the eastern boundary of Plaintiffs' property extending out into Lake Calm and is hereby enjoined from rebuilding the fence or from placing any barrier of any similar nature along said boundary other than the now existing wire fence which shall extend no further into Lake Calm than now constituted.
"2. That the Defendant, Elizabeth J. DuVal, shall immediately remove all of the fill and debris laden land which she has caused to be pushed out into Lake Calm along the southern boundary of the property of the Plaintiffs, Vernon T. Thomas and Ruby Lee Thomas, and re-established the lake shore line in substantially the same condition as the same existed prior to the pushing of said fill and debris laden land out into the lake; and the Defendant, Elizabeth J. DuVal, is hereby enjoined from erecting any barriers or fences of any similar nature along the southern boundary of the property of the Plaintiffs, Vernon T. Thomas and Ruby Lee Thomas, which extends out into Lake Calm."
The chancellor having studied the record, and testimony of all the witnesses, further found by his final decree the following facts:
"* * * that the Plaintiffs, Vernon T. Thomas and Ruby Lee Thomas, are the owners of a portion of the bed of Lake Calm which lies over and upon the southeastern corner of their property; that the Defendant, Elizabeth J. DuVal, is the owner of a portion of the bed of Lake Calm adjoining the Plaintiffs' property to the south; that the Defendant, Marian Hruby, is the owner of a portion of the bed of Lake Calm adjoining the Plaintiffs' property to the east; that all of said parties have a mutual corner at the southeastern corner of the Plaintiffs' property; that Lake Calm is not a navigable lake; that the Defendant, Elizabeth J. DuVal, has erected a barrier consisting of fill and debris approximately ten feet in width immediately adjacent to the Plaintiffs' south line running from the shore line to the southeastern corner of Plaintiffs' property; that said barrier was constructed to serve and serves no useful purpose; that the Defendant, Marian Hruby, constructed, or attempted to construct, a fence immediately adjacent to Plaintiffs' property on the east from the shore line to Plaintiffs' southeastern corner which said fence was only for the purpose of *150 keeping said Defendant's child and pets on her own property; that the Defendant, Marian Hruby, had constructed no other fence around the other portions of her property; that the fence at the time of the trial of the case consisted of a wire fence and posts extending approximately ten feet into the lake and posts thereafter to the southeastern corner of the Plaintiffs' property."
For the purpose of understanding this situation we attach hereto a handmade map which gives a fairly close pictorial view of the situation that we are called upon to decide. The map was not made by an engineer and it is used primarily for the purpose of a pictorial view.

*151 The two defendants in their appeals have separate briefs on the points that they have raised but we believe that one question which is raised by one of the defendants is decisive in this case and that question is, does the owner of a portion of the bed of a nonnavigable land locked lake have the right to exercise exclusive dominion and control over that portion of the bed and the waters of the lake which he owns. The chancellor found certain facts, upon conflicting evidence, in his final decree and these facts we will take as true and hence, the question of law which has been raised will be determinative of this case.
At the outset we might say that we are indebted to James W. Cullis, Esquire, for his very valuable notes on Extent of Private Rights of Nonnavigable Lakes appearing in Volume 5, University of Florida Law Review, page 166, which appeared in 1952. On the right to use the author states:
"The riparian rights recognized by the common law are numerous; and as a general rule they are the same for both lakes and streams. The subsequent discussion is limited to the right of an owner of a portion of the bed of a lake to use the whole lake, although, as we have seen, this question requires a prior determination of the right of Florida riparian owners to acquire the bed at all, whether by operation of the general presumption or by the calls of a deed including portions of the bed of a lake. Assuming the possibility of such acquisition, can each riparian owner use the whole lake for fishing, boating, and bathing, or is he restricted to those waters overlying his fee? The various state courts have adopted one of two divergent views, the common law or the civil. The effort here is to summarize the two views without, however, presenting an exhaustive analytical examination of the rationale and history of each.
"The common law view restricts each owner to the use of the water immediately overlying his fee and regards any intrusion as a trespass; in other words, as to dominion no distinction is made between the land and the water. The civil law allows the owner of a portion of the bed to use the surface of the entire lake for fishing, boating, and bathing as long as he does not unduly interfere with the rights of the other proprietors.
"* * * * * *
"Perhaps the most persuasive argument for the civil law rule is its practicability. Many of Florida's lakes are relatively small and are used exclusively for private recreational purposes. To restrict each owner to his own waters seriously curtails and in some locations even prohibits, certain sports. The effect on the water skier and the sailing enthusiast is obvious. Restrained by a `reasonable use' limitation, however, each riparian owner can benefit from the whole lake and yet have his remedy against neighbors that indulge in improper use. On the other hand, the common law view offers some commercial advantages; and of course the standard arguments supporting nonabrogation of any common law rule apply here with equal force.
"Turning with misgivings to a search for the rule in Florida, the ironic specter of 30,000 lakes and no case law arises. A study of the decisions and statutes relating in any way to lakes furnishes few if any clues to the position that the Florida Supreme Court will take when faced with the problem. Our adoption of the common law of England will manifestly constitute an argument in favor of accepting the common law theory, although topographically Florida and England have little in common. A century ago, when our English legal heritage commanded greater recognition *152 and when individual rights in property were held in higher esteem than public rights, the civil law theory would no doubt have received less favorable consideration. Today, however, public rights are assuming increasing prominence, and adoption of this rule would not only bestow by law greater practical benefits upon the common owners of the typical Florida lake but would in fact do little more than confirm the general practice followed for many decades in Florida.
"* * * * * *
"Whether the bed owner will be confined to the waters overlying his fee is a question that may arise any day, although as yet it had not reached our Supreme Court. It is submitted that, when the question does arise, adoption of the civil law view will best serve the interests of Florida, with its great inland lake area and its emphasis on sports and recreation, not only for Floridians but also on a broad commercial basis for tourists."
A case decided before the above article was written, Taylor v. Tampa Coal Co., Fla. 1950, 46 So.2d 392, 394, takes the "reasonable use" view as may be gathered from the opinion wherein it is stated in part:
"(1-4) It is the rule that the rights of riparian proprietors to the use of waters in a non-navigable lake such as the one here involved are equal. Except as to the supplying of natural wants, including the use of water for domestic purposes of home or farm, such as drinking, washing, cooking, or for stock of the proprietor, each riparian owner has the right to use the water in the lake for all lawful purposes, so long as his use of the water is not detrimental to the rights of other riparian owners. * * * The fact that one riparian owner may choose to use the water in the lake for recreational purposes while another may desire to divert it for an artificial use such as irrigation, will not give the latter a superior right to take water to the detriment of the former, for in this jurisdiction there is no distinction in respect to use between a farm and a summer residence. The use of lands bordering on, and the waters of, such a lake, for the purpose of pleasure, recreation and health constitutes such a use of the lake as to command a remedy for an unlawful interference with its natural condition. * * *"
The Supreme Court of Arkansas in 1955 in the case of Harris v. Brooks, 1955, 225 Ark. 436, 283 S.W.2d 129, 133, 54 A.L.R.2d 1440, cited with approval Taylor v. Tampa Coal Co., supra, and in discussing the reasonable use theory has this to say:
"Reasonable Use Theory. This theory appears to be based on the necessity and desirability of deriving greater benefits from the use of our abundant supply of water. It recognizes that there is no sound reason for maintaining our lakes and streams at a normal level when the water can be beneficially used without causing unreasonable damage to other riparian owners. The progress of civilization, particularly in regard to manufacturing, irrigation, and recreation, has forced the realization that a strict adherence to the uninterrupted flow doctrine place an unwarranted limitation on the use of water, and consequently the court developed what we now call the reasonable use theory. * * * It has been stated that each riparian owner has an equal right to make a reasonable use of waters subject to the equal rights of other owners to make the reasonable use, United States v. Willow River Power Co., 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101. The purpose of the law is to secure to each riparian owner equality in the use of water as near as may be by requiring each to exercise his right reasonably *153 and with due regard to the rights of others similarly situated. Meng v. Coffey, 67 Neb. 500, 93 N.W. 713, 60 L.R.A. 910."
We had this question before us in the case of Lake Gibson Land Company v. Lester, Fla.App., 102 So.2d 833, which opinion was handed down during May of 1958 by this court, where we discussed Taylor v. Tampa Coal Co., supra, as well as Harris v. Brooks, supra, and in which we followed the Taylor case and cited with approval the Harris case. In the cases cited by the defendants the decisions are primarily controlled by other factors. In the case of Taylor Fishing Club v. Hammett, Tex.Civ.App. 1935, 88 S.W.2d 127, the decision is favorable to the defendants, and among all of the cases cited there are some statements which would appear to be favorable to the defendants' side of the case. However, in our study of the law a large number of cases have statements in them which could be used as persuasive authority towards the plaintiffs' side of the case. In Florida we recognize and apply the rule that when one's lawful use for such purposes as fishing, recreation and irrigation is unreasonably interfered with, the owner of riparian rights, such as the plaintiff here, will have the remedy of injunction. In the instant case the fill of debris running out into the lake could, under no stretch of the imagination, answer any reasonable use or need of one defendant any more than could the fence of the other defendant in protecting her children and pets. It is not denied that the maintenance of these obstructions would not only interfere with, but would effectively prohibit plaintiffs from making any use of the lake other than the very small, shallow portion overlying their land.
There is one case that both defendants have cited in the briefs and that is the case of Osceola County v. Triple E. Development Company, Fla. 1956, 90 So.2d 600. We have read this case but in its final analysis that case is only authority for the proposition that where a lake is entirely owned by one party the court would enjoin an attempted eminent domain which was for the purpose of building a roadway for the public to use the privately owned lake. This case is no authority for the principle in the instant case.
Affirmed.
ALLEN, Acting Chief Judge, and MORROW, R.O., Associate Judge, concur.